J-A27017-16

2017 PA Super 309

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MANUEL ROSE | |
| Appellant | No. 3471 EDA 2014 |

Appeal from the Judgment of Sentence August 14, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008926-2013

BEFORE:  PANELLA, J., LAZARUS, J., and FITZGERALD, J.[*]

OPINION BY LAZARUS, J.:                    **FILED SEPTEMBER 29, 2017**

Manuel Rose appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following his conviction for burglary[1] and simple assault.[2]  After careful review, we affirm.

At approximately 4:00 a.m. on May 21, 2013, Ralph Sheridan was asleep on the couch of the first floor of Georgette Walton's home at 3132 Tasker Street, Philadelphia, where he was renting a room.  While Sheridan was sleeping, Rose forced his way into the home through the window by the couch.  Once inside the house, Rose approached Sheridan and sat on top of him.  As Sheridan awoke, he became aware that Rose was pushing the covers over his face and had placed

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 3502(a)(1).

[2] 18 Pa.C.S. § 2701(a).

a silver firearm against his head behind his left ear. Rose demanded that Sheridan give him all his "F-in money." N.T. Trial, 4/8/14, at 20. Sheridan pulled the covers away from his face and immediately recognized Rose, whom he knew as "Moe," since Sheridan was friends with Rose's brother, Mack. An altercation between Sheridan and Rose followed, in which Sheridan grabbed for the gun and threw Rose off of him. Rose attempted to hit Sheridan with the gun, but Sheridan pushed Rose and ran out of the house. During the fight, Rose told Sheridan he would kill him if he called the police.

Sheridan ran to his next door neighbor's house and was allowed inside. His neighbor, Lawrence Smith, listened while Sheridan told him what had happened. While they were talking, Sheridan looked out Smith's window and saw Rose running up the street towards an alley. Smith also looked out his window and saw Walton's Cadillac being driven away by a man with a bald head. Smith told the police later that evening that he was 70% sure that the man he saw in the car was Rose.

Smith called Walton on the phone; she had remained asleep upstairs and did not know her house had been burglarized. She walked to her stairs and saw that her windows and front door were open. Immediately thereafter, at approximately 4:25 a.m., Walton sat on the steps and called 911 because she was too afraid to go downstairs. While she was on the 911 call, Walton looked outside through the open front door and confirmed that her 2006 Cadillac was missing. It was later learned that Sheridan's keys for the Cadillac were also

missing from the house. When he fled from the house, Sheridan had left his set of the keys on the table near the couch where Rose had threatened him.

After she called the police, Walton spoke with Sheridan about what had happened. According to Walton, Sheridan told her that Rose broke in through the window, opened the door to let another individual, named Frizz, into the house, attacked Rose and then fled the scene. Walton then got dressed, walked downstairs to make sure nobody was in the house, and shut the door and the window where Rose had entered the house. When Walton closed the window, she noticed that the screen to the window was up and that the blinds to the windows had become disheveled.

After arriving on scene shortly thereafter, a police officer transported Walton and Sheridan to the police station where they were interviewed. Walton was interviewed by Detective Darnell Hobbs and Sheridan was interviewed by Detective John Frei. Walton told Detective Hobbs that she had seen Rose the previous Saturday. Based on Walton's description of Rose, Detective Hobbs prepared an eight-person photo array that included Rose's picture. Meanwhile, Detective Frei interviewed Sheridan for approximately an hour. Detective Frei noticed that he was visibly shaken and nervous throughout the interview. Detective Frei showed the photo array prepared by Detective Hobbs to Sheridan; he unequivocally identified Rose as the burglar. Detective Hobbs prepared a search warrant for Rose's house and an arrest warrant for Rose. Detective Frei traveled to Walton's house to process the crime scene, where he noticed that

the screen to the window where Rose broke in was all the way up and that the blinds by the window were disheveled.

The next day, Walton received a phone call from an unidentified individual notifying her that her car was parked in North Philadelphia. Walton informed the police and then traveled with Mack and Sheridan to retrieve the car, which was abandoned and parked on the street, with the keys inside. After they waited about an hour, a police officer arrived and told Walton to drive her car home. Officer Kimyatta Davies was immediately dispatched to Walton's home to guard to preserve possible fingerprints until it was taken into police custody. Detective Hobbs lifted three fingerprints from the outside of the car. Fingerprint examiner Andrea Williams later concluded to a reasonable degree of scientific certainty that the fingerprint lifted from the passenger side front door of the car matched Rose's fingerprints. Sometime thereafter, Rose turned himself into the police and was arrested.

Prior to trial, Rose's preliminary hearing was scheduled on three separate occasions. Sheridan failed to appear at the first scheduled preliminary hearing because he had moved and failed to receive notice of the hearing. For the second preliminary hearing, however, Sheridan was notified but failed to appear because he was scared he would be harmed. Sheridan later testified at the third preliminary hearing. After the third preliminary hearing, Rose made a number of prison calls revealing, among other things, that he had worked with others to prevent Sheridan from testifying at the preliminary hearing and trial. Rose also admitted to his knowledge of and involvement in the burglary. At trial, the jury

was provided with an agreed-upon transcript of the prison phone calls, and Detective Frei was permitted to testify as a lay witness regarding the meaning of the street language used in the conversations. *See* N.T. Trial, 4/10/14, at 153-87; N.T. Trial, 4/11/14, at 30-31; Exhibit G (Prison Phone Call Transcripts).

Also at trial, the prosecutor broke the sequestration order that was in place for the witnesses of the incident. Specifically, Assistant District Attorney (ADA) Kevin Harden informed Sheridan that Walton had testified that two people had been present during the burglary, when Sheridan had always indicated to police that Rose was acting alone. Walton's testimony occurred on a Friday; ADA Harden immediately initiated an investigation of the second person, whom Walton knew as "Frizz," over the weekend. Through this investigation, Frizz was identified as Dawu, a person mentioned in some of the prison phone calls Rose had made.

ADA Harden disclosed his violation of the sequestration order the following Monday. Rose moved for a mistrial, which the court denied. Instead, the court permitted Rose's counsel to have an overnight period of investigation regarding the revelation that Frizz was present during the burglary. Defense counsel interviewed Sheridan during the investigation period, and Sheridan indicated that he had not wanted to reveal Frizz's identity because he was afraid for his life and did not want to testify against him. When trial resumed, Sheridan changed his testimony from his previous accounts of the burglary to indicate that two people, Rose and Frizz, had actually been present. In Sheridan's

version of events, Frizz had not entered Walton's residence, but had been outside and had recovered the gun from Rose when he fled the scene.

On April 16, 2014, the jury convicted Rose of burglary and simple assault. The court sentenced Rose on August 14, 2014, to 25 to 50 years' imprisonment because his burglary conviction had a 25-year mandatory minimum as a "third strike" conviction for a crime of violence. *See* 42 Pa.C.S. § 9714. Rose filed a timely post-sentence motion, which the court denied on November 21, 2014. Thereafter, Rose filed a timely notice of appeal followed by a court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).[3]

Rose raises the following issues for our review:

1. Did not the trial court err in denying [Rose's] motion for mistrial or to preclude the testimony of Ralph Sheridan, where the prosecutor intentionally violated the court's sequestration order and disclosed the content of another witness'[] testimony to Ralph Sheridan in the middle of trial, which resulted in [Sheridan] altering his testimony and significantly impacting the outcome of the trial, and a jury instruction was not sufficient to cure the taint of the violation?

---

[3] Rose filed an initial timely Rule 1925(b) statement and simultaneously requested an extension of time because the relevant notes of testimony were not yet complete. On May 20, 2015, once the notes of testimony were complete, the court issued an amended 1925(b) order, directing Rose to file a supplemental concise statement within 14 days. However, counsel never received the amended order and did not receive a complete set of the notes of testimony at that time. Thereafter, on July 6, 2015, Rose's counsel requested a remand to the trial to obtain a complete set of the notes of testimony and to allow him to file a supplemental concise statement. Our Court granted the motion and the trial court issued an order on August 24, 2015, directing Rose to file a supplemental Rule 1925(b) statement within 21 days. Rose did so on September 14, 2015.

2. Did not the trial court err in permitting Ralph Sheridan to testify to incidents of intimidation, where there was no evidence that those incidents occurred at [Rose's] behest, where [Sheridan] was cooperative with the prosecution both at the time of his initial statement and at trial, and where such evidence was therefore both irrelevant and grossly prejudicial?

3. Did not the trial court err by admitting recorded calls and the lay testimony interpreting them, where: 1) the lay witness testimony of Detective Frei "interpreting" "street language" in recorded prison phone calls invaded the province of the jury, his "interpretations" were based on pure speculation and the language in the calls required no interpretation; and 2) the content of the calls themselves were inadmissible in that they contained inadmissible hearsay?

4. Did not the lower court err by imposing a "third strike" sentence under 42 Pa.C.S. § 9714 where [Rose's] prior conviction for robbery under New Jersey [law] was not an "equivalent crime" as defined in 42 Pa.C.S. § 9714(g)?

Brief for Appellant, at 4-5.

In his first issue, Rose asserts that the trial court should have declared a mistrial after the ADA violated the court's sequestration order and disclosed the content of Walton's testimony to Sheridan. Rose's counsel moved for a mistrial after the violation was disclosed; he also asked, in the alternative, for time to investigate based upon the newly-disclosed information. The court denied the motion for a mistrial and allowed the defense to investigate before resuming trial the following day.[4] At the conclusion of the trial, the court also provided a jury instruction indicating that ADA Harden broke the sequestration order and that Sheridan changed his testimony after ADA Harden informed him of Walton's testimony. N.T. Trial, 4/11/14, at 202-03.

_____

[4] Two days after declining to call a mistrial, the court ruled that the sequestration order had been violated. *See* N.T. Trial, 4/10/14, at 10-13.

Where violation of a sequestration order occurs, the remedy selected

is within the sound discretion of the trial court. In exercising its discretion, the trial court should consider the seriousness of the violation, its impact on the testimony of the witness, and its probable impact on the outcome of the trial. We will disturb the trial court's exercise of its discretion only if there is no reasonable ground for the action taken.

***Commonwealth v. Smith***, 346 A.2d 757, 760 (Pa. 1975). "Additionally, the trial court should consider whether . . . the party calling the witness procured his disobedience." ***Commonwealth v. Mokluk***, 444 A.2d 1214, 1216 (Pa. Super. 1982) (citation omitted). Further, "[a] mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." ***Commonwealth v. Simpson***, 754 A.2d 1264, 1272 (Pa. 2000).

Instantly, the ADA's purposeful decision to break the sequestration order was a serious violation in which the Commonwealth "procured the disobedience" of its own witness. ***Mokluk***, *supra*. The violation of the sequestration order clearly caused Sheridan to change his testimony to indicate that two people were present during the burglary, when he had previously indicated that only Rose was involved. Rose asserts that the violation had an impact on the outcome of the trial by "chang[ing] the entire course of the trial . . . [T]he Commonwealth was able to spin a story of threats and intimidation linked to [Frizz], and by association, to Mr. Rose." Brief for Appellant, at 26. However, regarding the actual elements of the crime of burglary, Frizz's presence "did not substantively change [Sheridan's] consistent account that [Rose] broke into the house through

the window, put a sheet over [Sheridan's] head, demanded that [Sheridan] give [Rose] his money, and threatened to kill [Sheridan] for calling the cops." Trial Court Opinion, 12/11/15, at 13. Thus, the trial court had reasonable grounds to permit a period of investigation rather than declare a mistrial. Additionally, Rose requested an investigation period as discussed above. Accordingly, Rose received his requested remedy, and the trial court did not abuse its discretion. *Smith*, *supra*.

Moreover, as the trial court noted, its jury instruction "pointedly explained that [Sheridan] lied when he testified that he revealed Frizz's involvement to ADA Harden before Ms. Walton's testimony, [which] is a dream scenario for any defendant and overcomes any possible prejudice that [Rose] may have faced by not granting a mistrial and starting the trial anew." Trial Court Opinion, 12/11/15, at 14. Additionally, we note that we have previously affirmed the denial of a mistrial motion made after a prosecution witness' testimony was alleged to be "openly deceptive, sarcastic and insulting" since it was "arguable, particularly in view of defense counsel's exhaustive efforts to destroy [the witness'] credibility . . . that [his] cavalier attitude on the witness stand benefited appellant." *Commonwealth v. Krasner*, 427 A.2d 1169, 1179 (Pa. Super. 1981). Similarly, in this matter, defense counsel thoroughly cross-examined Sheridan and attacked his credibility with the inconsistencies in his reports of the crime. Accordingly, we find that Rose was not deprived of a fair trial. *Simpson*, *supra*.

In his second issue, Rose argues that the court erred in permitting Sheridan to testify to incidents of intimidation, claiming that such evidence was irrelevant and prejudicial. While Rose objected to this testimony at trial, the objection was a bald objection without specificity. In his Rule 1925(b) statement, Rose objected on grounds that the evidence included statements that were inadmissible hearsay. The argument Rose includes in his brief differs, in that instead of asserting inadmissible hearsay, Rose's argument is focused on relevance. Because a specific objection was not raised for the first time until it was included in Rose's Rule 1925(b) statement, we find this issue waived. ***See Commonwealth v. Lopez***, 57 A.3d 74, 82 (Pa. Super. 2012) (appellate claim that testimony was inadmissible hearsay waived where, at trial, counsel merely objected without explanation); ***see also Commonwealth v. Gordon***, 528 A.2d 631, 639 (Pa. Super. 1987) ("Our Supreme Court's rules on issue preservation simply do not allow the parties to change their theories for relief indiscriminately as they move through the trial and appellate processes.").

Next, Rose asserts that the trial court erred by permitting Detective Frei to interpret street language in recorded prison phone calls, arguing that this invaded the province of the jury and the content of the calls itself was inadmissible hearsay.[5]

---

[5] As to the contention that the calls contained inadmissible hearsay, we note that at trial, the jury was provided with an agreed-upon transcript of the content of the calls. ***See*** N.T. Trial, 4/10/14, at 153-55. Thus, we find this argument to be without merit.

- 10 -

Among other conversations, when speaking about the burglary in the prison phone calls, Rose discussed preventing Sheridan from testifying as follows:

[Rose]: So Inshallah I can give [my mom] a call tonight because I wanna let her know what's going on because I don't think she actually knows. Cause I told you . . . Cause I told you I talked to her. And it was all suppose to be. Yah mean. Good good. Now I had a . . . Called Dawu[] and said he uh talked to Mack. And Mack seen[,] Mack seen the individual too. And he was like nah that's a good look [inaudible] and he was like nah I ain't gon fuck ya people's up over like that it wasn't him this that and the other. Ya feel me?

. . .

They was calling my name at that point. Now when I got in the jawn the broad was like "Yeah they brought him in." So they might have went and got him.

. . .

But the only thing like I said when I talk to Mack you know this is how we going to handle it like cool because I could have handled it another way.

[Recipient]: Mmhmm.

[Rose]: I should have did it on my own but then it would have been a lot[.] I'd a been cool[;] I'd a been cool.

Exhibit G, at 14-15, 19. Detective Frei testified that the above meant that Rose "doesn't believe his mother knows what happened in court today, because he had earlier assurances from her that everything was going to be okay," N.T. Trial, 4/10/14, at 177, that "law enforcement[] picked up Ralph," *id.* at 177-78, and that Rose indicated that he "should have [taken] care of it himself and not depend[ed] on other people to make sure it was all good, good for him." *Id.* at 178.

- 11 -

Rose indicated his involvement in the burglary as follows:

I can't blame vicinity area people cause everything is a choice . . . Well I'm hearing situation with the people but you not hearing my situation. Because maybe it didn't go down like that. Maybe that nigga had the thing. Maybe I was trying to take the jawn from him. You don't know you weren't there you gon[na] take what he say. I can't really talk about it. But the bottom line was it was an issue something that had issue and it had um it had um it had some validity to it[.]

Exhibit G, at 20-21. Detective Frei testified that this meant that Rose "is not going to put blame on somebody else for actions that he took." N.T. Trial, 4/10/14, at 182. Further, the detective indicated that Rose "heard what [Sheridan] has been saying happened[,] but nobody is hearing what he said happened. . . . Maybe it didn't go down the way that [Sheridan] said it happened," and "[t]hey were fighting over a firearm." *Id.* 184-85. ADA Harden finished questioning Detective Frei regarding this particular conversation with the following:

Q: Based on your opinion, does it make sense that, based on your investigation, that [Sheridan] had the gun and not the defendant like the defendant was asserting here?

A: No.

Q: Why not?

A: Because [Sheridan] was asleep and the defendant stuck the gun to [Sheridan's] head.

*Id.* at 185. Defense counsel objected. The court sustained the objection and instructed the jury to disregard the detective's final statement. *Id.* at 186.

In the midst of the Commonwealth presenting the above conversations, the court provided a jury instruction indicating that regardless of Detective Frei's

opinion testimony, the jury alone was charged with making credibility determinations and deciding the proper weight to give to the evidence presented. *See* N.T. Trial, 4/11/14, at 26-29.

Detective Frei was permitted to testify regarding the meaning of the words in Rose's prison phone calls as a lay witness. Pursuant to Pennsylvania Rule of Evidence 701,

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a)    rationally based on the witness's perception;
>
> (b)    helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c)    not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701. We may reverse the trial court's admission of lay witness testimony only if the court abused its discretion. *Commonwealth v. Randall*, 758 A.2d 669, 679 (Pa. Super. 2000). "[I]f in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error." *Commonwealth v. Sitler*, 144 A.3d 156, 163 (Pa. Super. 2016) (citation omitted).

The precise issue in this matter is one of first impression in Pennsylvania. We note that in *Commonwealth v. Huggins*, 68 A.3d 962 (Pa. Super. 2013), in a prosecution of various drug crimes, a drug enforcement agent was permitted to testify as an expert regarding street language and as a lay witness regarding his fact-based knowledge of the investigation. *Id.* at 974. This Court found no error in allowing the agent "to testify in dual capacities," since the Rules of

Evidence do not prohibit such testimony and the court instructed the jury in order to minimize confusion. *Id.* However, the instant matter presents the converse situation, where an officer testified as a lay witness regarding the meaning of street language.

Because no Pennsylvania case law is directly on point, we turn to federal court decisions as a guide. ***Commonwealth v. Ragan***, 743 A.2d 390, 396 (Pa. 1999) ("[T]his Court is not bound by decisions of federal courts inferior to the United States Supreme Court, even though we may look to them for guidance."); ***see also Huggins***, 68 A.3d at 968 n.5 (because Pennsylvania Rule of Evidence 701 is substantively identical to its federal counterpart, examination of federal law is instructive). We find the reasoning employed by a number of the United States' Circuit Courts of Appeals to be persuasive. ***See United States v. Freeman***, 730 F.3d 590, 596 (6th Cir. 2013) (prosecution failed to establish proper foundation for lay testimony given by Federal Bureau of Investigation (FBI) agent regarding his personal impressions of recorded conversations between defendant and co-defendants; therefore, testimony was inadmissible in prosecution for murder for hire; five other Circuit Courts have held testimony inadmissible under similar circumstances).

As the Court of Appeals for the 6th Circuit noted, "[c]ourts often qualify law enforcement officers as *expert witnesses* under [Federal Rule of Evidence] 702 to interpret intercepted conversations that use 'slang, street language, and the jargon of the illegal drug trade.'" ***United States v. Kilpatrick***, 798 F.3d 365, 379 (6th Cir. 2015) (quoting ***United States v. Peoples***, 250 F.3d 630, 641 (8th

Cir. 2001)). However, "[i]n contrast, **when an officer is *not* qualified as an expert, the officer's lay opinion is admissible 'only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred.'"** *Kilpatrick*, 798 F.3d at 379 (quoting *Peoples*, 250 F.3d at 641)) (emphasis added). Stated another way, lay testimony is intended to describe something that jurors otherwise had not been able to experience for themselves, by drawing upon the sensory and experiential observations that the witness made firsthand. *Kilpatrick*, 798 F.3d at 379.

Instantly, Detective Frei did not participate in the prison phone conversations, did not have personal knowledge of the facts being related, and did not observe the conversations as they occurred. ADA Harden admitted as much when he stated that "never have I actually said that my officer had any specialized [] familiarity with Mr. Rose. He doesn't know him from a can of paint. He knows the case." N.T. Trial, 4/11/14, at 22-23. This level of knowledge has been held to be insufficient to permit the type of lay testimony Detective Frei provided. *See Freeman*, 730 F.3d at 596 (inadequate foundation for lay testimony where FBI agent never specified personal experiences leading to his information but instead relied on general knowledge of investigation). Therefore, Detective Frei was not qualified to testify to the meaning of the conversations as a lay witness. Instead, Detective Frei should have been qualified as an expert in order to testify to the meaning of any of the particular words within the conversations. *Huggins*, *supra*; *Kilpatrick*, *supra*.

Furthermore, Detective Frei's testimony as to the meaning of Rose's conversations, sentence by sentence, went well beyond the Commonwealth's proffer that he would testify regarding the meaning of certain street language. Accordingly, we find that the trial court misapplied the law and abused its discretion in permitting Detective Frei to testify as a lay witness regarding the content of Rose's prison phone calls. ***Sitler***, ***supra***.

Having determined that the trial court abused its discretion, we next turn to whether the error was harmless. ***See Commonwealth v. McClure***, 144 A.3d 970, 975-76 (Pa. Super. 2016) ("In the event of an erroneous admission of evidence, a verdict can still be sustained if the error was harmless."). "Harmless error exists if . . . the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict." ***Commonwealth v. Mitchell***, 135 A.3d 1097, 1106 (Pa. Super. 2016).

As we noted above, Sheridan's identification of Rose and account of him breaking into Walton's home and threatening him with a gun remained unchanged throughout the investigation and proceedings of the case. Additionally, the majority of the content of the prison phone calls involved efforts to intimidate Sheridan rather than discussions directly relating to Rose's involvement in the burglary. Thus, the evidence of Rose's guilt was overwhelming in comparison to any prejudicial effect that resulted from Detective Frei interpreting the prison phone calls. ***Id.*** Moreover, as we previously indicated, the court instructed the jury to weigh the evidence and

- 16 -

make its own credibility determinations. **See Commonwealth v. Means**, 773 A.2d 143, 157 (Pa. 2001) (it is well-established that jurors are presumed to follow instructions). Accordingly, we find that the trial court's error in permitting Detective Frei to testify as a lay witness regarding the meaning of portions of the conversations was harmless, and we decline to reverse the court on this basis.

In his final issue, Rose asserts that the court erred by imposing a "third strike" minimum sentence, claiming that Rose's prior conviction for robbery under New Jersey law was not an "equivalent crime" as defined in 42 Pa.C.S. § 9714(g). We note that a challenge to the applicability of a mandatory sentencing statute such as section 9714 is a challenge to the legality of the sentence. **See Commonwealth v. Shiffler**, 879 A.2d 185, 188-89 (Pa. 2005) (challenge to applicability of section 9714 raises question of statutory construction, which is pure question of law implicating legality of sentence).

Pursuant to section 9714(a)(2),

> [w]here the person had at the time of the commission of the current offense previously been convicted of two or more such crimes of violence arising from separate criminal transactions, the person shall be sentenced to a minimum sentence of at least 25 years of total confinement, notwithstanding any other provision of this title or other statute to the contrary.

42 Pa.C.S. § 9714(a)(2). Section 9714(g) lists crimes that qualify as "crimes of violence," including burglary, as defined in 18 Pa.C.S. § 3502(a)(1). **See** 42 Pa.C.S. § 9714(g).

Instantly, Rose was convicted of felony burglary pursuant to section 3502(a)(1). Previously, Rose was convicted of first-degree robbery, a felony,

once in Pennsylvania and once in New Jersey. Pursuant to section 9714(g), "crimes of violence" include "robbery as defined in 18 Pa.C.S. 3701 § (a)(1)(i), (ii), (iii) (relating to robbery) . . . or an equivalent crime in another jurisdiction." 42 Pa.C.S. § 9714(g). Rose specifically argues that his robbery conviction under New Jersey law[6] was not equivalent to the particular types of robbery in Pennsylvania that are considered to be "crimes of violence."[7] Brief for Appellant, at 51.

---

[6] The New Jersey robbery statute is as follows:

**a. Robbery defined.** A person is guilty of robbery if, in the course of committing a theft, he:

(1) Inflicts bodily injury or uses force upon another; or

(2) Threatens another with or purposely puts him in fear of immediate bodily injury; or

(3) Commits or threatens immediately to commit any crime of the first or second degree.

An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.

**b. Grading.** Robbery is a crime of the second degree, except that it is a crime of the first degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.

N.J.S.A. § 2C:15-1.

[7] In Pennsylvania, a robbery that is a "crime of violence" occurs when, in the course of committing a theft, a person:

(i) inflicts serious bodily injury upon another;

- 18 -

To determine whether a crime in another state is equivalent to a Pennsylvania offense, a court must consider "the elements of the foreign offense in terms of classification of the conduct proscribed, its definition of the offense, and the requirements for culpability." *Commonwealth v. Northrip*, 985 A.2d 734, 740 (Pa. 2009) (quoting *Commonwealth v. Shaw*, 744 A.2d 739, 743 (Pa. 2000)). Additionally, a court shall consider the "underlying public policy behind the two criminal statutes. . . . We note that the offenses do not identically have to mirror each other but must be substantially equivalent to invoke operation of 42 Pa.C.S. § 9714." *Commonwealth v. Ward*, 856 A.2d 1273, 1277 (Pa. Super. 2004).

The difference between the New Jersey and Pennsylvania robbery statutes, upon which Rose focuses, is that the New Jersey statute permits robbery to be graded as a first-degree offense if the defendant is merely **armed** with a deadly weapon, whereas the Pennsylvania statute does not. *See* notes 4, 5, *supra*. Otherwise, the statutes include nearly identical elements and grading for robbery offenses of the first degree, including that threatening or inflicting serious bodily injury on another while committing a theft is a first-degree offense. Additionally, the statutes are aimed at preventing the same criminal activity, indicating that the public policy rationale for both statutes is identical. *Ward*, *supra*.

---

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury; [or]

(iii) commits or threatens immediately to commit any felony of the first or second degree[.]

18 Pa.C.S. § 3701; *see* 42 Pa.C.S. § 9714(g).

We also note that our three strikes law "neither directs nor requires the court to consider *every possible set of circumstances* in order to determine whether the mandatory sentence applies." **Northrip**, 985 A.2d at 740 (not appellate court's task to imagine whether any possible factual scenario exists that would result in conviction in another state and acquittal in Pennsylvania); *see also Commonwealth v. Greene*, 25 A.3d 359, 365 (Pa. Super. 2011) (stating in *dicta* that "there would be no dispute that" Massachusetts armed robbery statute substantially similar to Pennsylvania robbery statute; Massachusetts statute, similar to New Jersey statute, applies when a person commits robbery while armed with dangerous weapon). Accordingly, we find that the trial court properly considered Rose's New Jersey robbery conviction to be a "crime of violence" and a strike toward his "three strikes" conviction in the instant matter.

For the foregoing reasons, we affirm the trial court.

Judgment of sentence affirmed.

Judge Panella joins the Opinion.

Justice Fitzgerald concurs in the result.

*Judgment Entered.*

_____
*Joseph D. Seletyn, Esq.*
*Prothonotary*


Date: *9/29/2017*