J-S32019-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
DARNELL LAMONT MCLEAN :
:
Appellant : No. 1744 MDA 2017

Appeal from the Judgment of Sentence August 30, 2017
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0001342-2016

BEFORE: PANELLA, J., NICHOLS, J., and PLATT, J.[*]

MEMORANDUM BY NICHOLS, J.: **FILED JULY 17, 2018**

Appellant Darnell Lamont McLean appeals from the judgment of sentence entered following his conviction for aggravated assault.[1] Appellant asserts that the trial court abused its discretion in admitting crime scene photographs into evidence and allowing a witness to testify about the characteristics of individuals going through shock without qualifying the witness as an expert. We affirm.

In the late hours of July 21, 2016, into the early hours of July 22, 2016, Appellant was at a bar. At approximately 1:10 a.m., Marvin Trotter (Victim) left the bar, trailing behind a group comprised of his brother, Charles Trotter, and two friends. N.T., 6/5/17, at 84-85, 149. Appellant exited the bar after

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2702(a)(1).

Victim and confronted him approximately half a block from the bar. *Id.* at 86. An altercation ensued, during which Appellant slashed Victim multiple times with a box cutter, inflicting head wounds and cutting seven tendons in Victim's left hand. *Id.* at 93-94. Victim also had a small knife, with which he cut Appellant's wrist slightly. N.T., 6/6/17, at 81. Appellant left Victim lying in the street. Victim was bleeding profusely and was going in and out of consciousness. N.T., 6/5/17, at 26, 29.

The police were contacted and they investigated the crime scene and surrounding areas. Officers took photographs of Victim at the scene and recovered Appellant's box cutter from a neighbor's yard, where Appellant had thrown it after the altercation. N.T., 6/5/17, at 58-60; N.T., 6/6/17, at 61. Appellant turned himself in to police later in the day on July 22, 2016, and thereafter was charged with attempted murder[2] and aggravated assault.

Prior to trial, Appellant filed a motion *in limine* seeking to exclude four color photographs of Victim taken following the altercation. One depicted Victim unconscious on the ground following the fight. A second showed a pool of blood around Victim. The third and fourth revealed blood flowing from Victim's wounds and running down his body.[3] The trial court denied Appellant's motion *in limine*.

_____

[2] 18 Pa.C.S. §§ 901, 2501(a).

[3] Appellant describes the photographs as follows:

A jury trial was held from June 5, 2017, through June 7, 2017. During opening statements, Appellant asserted that Victim instigated the physical altercation between Victim and Appellant and that Appellant responded in self-defense.

The court admitted the photographs of the Victim after the stabbing as Commonwealth's exhibits 1 through 4. After the trial court issued a cautionary instruction, N.T., 6/5/17, at 27, the Commonwealth published them to the jury.

The Commonwealth also called Victim, who testified that earlier in the night he was inside the bar. According to Victim, Appellant's girlfriend, Anastasia Kulp, was staring at him. *Id.* at 79. Victim approached Kulp and complimented her dress. *Id.* After Victim complimented Kulp, Appellant approached Victim and complimented Victim regarding his sneakers. *Id.* at 81.

---

Exhibit 1 shows [Victim] unconscious on the ground with his brother standing over him. Exhibit 2 shows "the pool of blood that's coming from the victim running down the street." Additional exhibits show cuts and blood both on the victim and on the ground surrounding the victim. In describing Exhibit 3, Officer Betz of the Chambersburg Police Department told the jury that it depicted a "stream of blood coming from the hand [of Victim] as well as from the head or neck area . . ." Exhibit 4 shows "additional blood running down toward the feet of [Victim]."

Appellant's Brief at 12-13 (citations omitted).

Victim testified that later, he was outside when Appellant came almost nose to nose with him. Victim attempted to push Appellant away, backed up, and then fell down. Victim testified that "the next thing [he knew he] woke up and [his] brother [was] over top of [him trying to help him]." *Id.*

Additionally, during the direct examination of one of the responding officers, Officer John Sgrignoli, the Commonwealth began to elicit testimony regarding the causes and effects of shock. Appellant objected, and during a sidebar conference, the Commonwealth asserted that it was putting forth the evidence to rebut Appellant's opening argument that Victim was "combative."[4] N.T., 6/5/17, at 49. The trial court overruled the objection, and Officer Sgrignoli testified that blood loss could result in shock and that a person suffering shock could lose consciousness or his awareness of people, place, or time, or events that happened. *Id.* at 47-50. We quote the relevant testimony in further detail below.

Appellant testified at trial that there were several interactions with Victim inside the bar. Appellant indicated that he observed Victim sitting beside Kulp with his arm around her chair, referring to her as "snow bunny." N.T., 6/6/17, at 47. Appellant testified that Victim apologized for speaking to Kulp in the manner that he did, but after apologizing, Victim stared at him

---

[4] The term "combative" was not actually used by Appellant's counsel to describe Victim. Rather, in his opening statement, defense counsel referred to Victim as instigating the altercation and asserted that Appellant acted in self-defense in wounding Victim with the box-cutter.

instead of walking away. *Id.* at 47-48. Appellant further indicated that Victim attempted to buy a single cigarette from Appellant, but Appellant refused. *Id.* at 48. Appellant also testified that as Victim was leaving the bar, Victim told him to "come outside pussy." *Id.* at 49.

Appellant testified that he exited the bar after Victim left. According to Appellant, his friend, Gershawn Samuels, arrived at the bar but was too late to be allowed to enter. *Id.* at 54-55. After Appellant went outside to talk to Samuels, Appellant decided he "wanted to view the situation." *Id.* at 55. Appellant explained that he believed Victim and his group of friends "were planning to jump [him] when the bar let out." *Id.* Appellant indicated that he approached Victim to "diffuse the situation." *Id.* at 56. Appellant stated that Victim swung at him with a knife, and that Appellant stabbed at Victim approximately five to six times in self-defense. *Id.* at 57-59. Appellant testified that he walked away from Victim once he fell to the ground and that Appellant did not realize the extent of the injuries he had inflicted on Victim. *Id.* at 60-61.

At the conclusion of the trial, the jury found Appellant not guilty of attempted homicide and guilty of aggravated assault. On August 30, 2017, the trial court sentenced Appellant to ten to twenty years of incarceration for aggravated assault.[5]

---

[5] At sentencing at this case, the trial court also found that Appellant had violated his probation in a prior matter at docket number CP-28-CR-0001659-

Appellant timely filed a post-sentence motion on September 11, 2017.[6]

On October 5, 2017, the trial court denied Appellant's post-sentence motion.

Appellant timely filed a notice of appeal on November 3, 2017. Thereafter,

Appellant timely filed a court-ordered statement of errors complained of on

appeal pursuant to Pa.R.A.P. 1925(b). The trial court complied with Pa.R.A.P.

1925(a).

Appellant raises the following questions for our review:

1. Whether the trial court abused its discretion in denying [Appellant's m]otion *in* [*l*]*imine* to exclude inflammatory evidence in the form of a number of crime scene photographs of [V]ictim, his blood, and his bloody clothing?

2. Whether the trial court abused its discretion in admitting expert testimony regarding the characteristics of individuals going through shock without first qualifying the witness as an expert?

Appellant's Brief at 7.

In his first issue, Appellant asserts that the trial court abused its

discretion when it denied his motion *in limine* to exclude the photographs of

Victim marked as exhibits 1 through 4. Appellant asserts that "[a]lthough the

nature and extent of a victim's injuries is potentially probative of an actor's

intent, introduction of graphic photographs was not an evidentiary need in

_____

2009, involving simple assault and theft convictions. The trial court sentenced Appellant to a consecutive sentence of one to two years of incarceration for simple assault and a concurrent sentence of six to twelve months of incarceration for theft. Appellant did not appeal from the sentence imposed at docket number 1659-2009.

[6] The tenth day following sentencing fell on Saturday, September 9, 2017. Therefore, Appellant's post-sentence motion filed on the following Monday was timely. **See** 1 Pa.C.S. § 1908; Pa.R.Crim.P. 720(A)(1).

establishing the [Victim's] injuries." *Id.* at 14. Appellant notes that there was testimony from the officers who responded to the scene and were able to describe Victim's wounds and "significant blood loss." *Id.* at 15. Appellant further argues that "the fact that no testimony from a medical professional was presented in the present case is indicative that the Commonwealth intended to rely on the inflammatory nature of the photographs to secure a conviction." *Id.* at 14-15 (citing *Commonwealth v. Watkins*, 108 A.3d 692, 724 (Pa. 2014) (*per curiam*)).

The admissibility of photographs of a victim is a matter that is within the sound discretion of the trial court. *Watkins*, 108 A.3d at 724.[7] To determine whether to admit potentially inflammatory photographs, a trial court must engage in the following analysis:

> First[,] a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Id.* (citation omitted); *see generally* Pa.R.E. 401, 402. Mere unpleasantness is not enough to prevent photographs from being admitted into evidence. *See*

---

[7] Although *Watkins* and the cases cited therein address the admissibility of photographs of a homicide victim, the standard remains the same for photographs of a non-homicide victim. *See, e.g.*, *Commonwealth v. Stein*, 548 A.2d 1230, 1233 (Pa. Super. 1988).

*Watkins*, 108 A.3d at 724. The trial court may caution the jury to not allow the photographs to prejudice them against the defendant. *See id.* at 725.

We note that inflammatory photographs have been held to be admissible in attempted homicide prosecutions as relevant to the issue of the defendant's intent to kill. *See Commonwealth v. Stein*, 548 A.2d 1230, 1233 (Pa. Super. 1988).[8] In ruling that the trial court's admission of black and white and color photographs depicting the victim's head and throat wounds was not an abuse of discretion, the *Stein* Court noted that the defendant "will not be permitted to brutalize his victim and then keep the jury from learning exactly how brutal the assault was." *Id.* at 1234.

As the Pennsylvania Supreme Court noted in *Watkins*, "[t]he condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony . . . such testimony does not obviate the admissibility of photographs." *Watkins*, 108 A.3d at 724 (citation omitted). Thus, *Watkins* stands for the proposition that in a homicide case, even where there is testimony relaying the nature of a victim's wounds, photographs of such wounds nevertheless may be admissible. *Id.*; *accord Commonwealth v. Hutchison*, 164 A.3d 494, 501 (Pa. Super. 2017) (indicating that in a non-homicide prosecution, a witness'

---

[8] Although *Stein* predated the enactment of the Pennsylvania Rules of Evidence, we may rely on such cases to the extent they do not contradict the rules. *Commonwealth v. Aikens*, 990 A.2d 1181, 1185 n.2 (Pa. Super. 2010).

ability to testify as to an individual's condition does not render photographs of the individual inadmissible).

Instantly, the trial court determined that the exhibits were admissible, noting:

> "[T]he availability of alternate evidence . . . does not obviate the admissibility of the photographs. [**Commonwealth v. McCutchen**, 454 A.2d 547, 549 (Pa. 1982).] The technical detail of a physician's testimony and medical records simply does not convey and depict the nature of the victim's injuries in the same way as a photograph. In this stabbing case[,] the photographs show the extensive blood loss suffered by the victim. The pictures may be somewhat difficult to look at, but the images convey the severity of the injury in a way unlike a medical professional or medical record. The Commonwealth [had] the opportunity to make use of this evidence . . . to prove the case against [Appellant], beyond a reasonable doubt.

Trial Ct. Op., 5/19/17, at 6.

We agree with the trial court that the photographs were not unduly prejudicial. Appellant was on trial for attempted murder and aggravated assault, which required the jury to consider whether Appellant specifically intended to kill or cause serious bodily injury to Victim. **See** 18 Pa.C.S. §§ 2501(a), 2702(a)(1). Moreover, we agree with the trial court that none of the challenged photographs were "particularly gruesome." **Watkins**, 108 A.3d at 725 (citation omitted). That the photographs may have been unpleasant is insufficient to bar admission. **See id.** at 724. Lastly, the trial court provided an instruction to the jury that they were not to allow the unpleasant nature of the photographs to stir their emotions.[9] **See id.** at 725. Thus, we find no

_____

[9] Indeed, the jury found Appellant not guilty of attempted murder.

- 9 -

abuse of discretion on the part of the trial court in admitting the photographs into evidence. *See id.* at 724.

In his second issue, Appellant asserts that the Commonwealth "improperly elicited testimony in the form of an expert opinion without first qualifying the witness as an expert." Appellant's Brief at 15. In particular, Appellant refers to the following portion of the Commonwealth's examination of Officer John Sgrignoli:

> [Commonwealth]: Okay. As an [emergency medical technician (EMT)] and as a police officer as well, have you dealt with persons who have lost significant amounts of blood?
>
> [Officer Sgrignoli]: Yes.
>
> [Commonwealth]: Other than just on this occasion?
>
> [Officer Sgrignoli]: Yes.
>
> [Commonwealth]: In the past had you dealt with persons who have lost blood similar amounts to what [Victim] had lost?
>
> [Officer Sgrignoli]: Yes.
>
> [Commonwealth]: And based upon your medical background, what kinds of things could cause a person to go into shock?
>
> [Appellant's Counsel]: Objection. Speculation.
>
> [Commonwealth]: I'll lay a further foundation, Your Honor.
>
> [The Court]: All right.
>
> [Commonwealth]: Officer Sgrignoli, as an EMT you were a full-time firefighter EMT?
>
> [Officer Sgrignoli]: Yes.
>
> [Commonwealth]: And so in the course of securing that job did you go through training?
>
> [Officer Sgrignoli]: Yes.

[Commonwealth]: What type of training did you go through?

[Officer Sgrignoli]: Through EMT school at the fire academy.

[Commonwealth]: EMT school, specifically, I want to talk about that rather than the firefighting unless they intersect. The EMT school, what kind of training do you go through? How long does it take? What kind of classes?

[Officer Sgrignoli]: I don't remember how many hours it was, but it's about three months long. At the end you have to take a test for national accreditation so you are accredited as an EMT nationally.

[Commonwealth]: And you took that test?

[Officer Sgrignoli]: Yes.

[Commonwealth]: And you passed it?

[Officer Sgrignoli]: Yes.

[Commonwealth]: Did you have to pass that national accreditation in order to get your job as an EMT?

[Officer Sgrignoli]: Yes.

[Commonwealth]: All right. So in the course of your training as an EMT were you taught factors that would cause a person to go into shock?

[Officer Sgrignoli]: Yes.

[Commonwealth]: In your job as an EMT and as a police officer have you ever dealt with persons who have gone into shock?

[Officer Sgrignoli]: Yes.

[Commonwealth]: So based upon that training and experience that you discussed, what kind of things can cause a person to go into shock?

[Officer Sgrignoli]: A significant amount of blood loss.

[Commonwealth]: Would the amount of blood loss that [Victim] endured that you saw, could that cause him to go into shock?

[Appellant's Counsel]: Objection. May I have a sidebar[?]

[The Court]: Yes.

(Discussion had at sidebar.)

[Appellant's Counsel]: It seems like Mr. Augustine is trying to lay a foundation for him to give an opinion, expert opinion, based upon your training as an EMT. What do you think?

[Commonwealth]: I am not trying to solicit an opinion nor am I trying to qualify him as an expert. However, Mr. Arnoult has made statements that part of his defense is that [Victim] was combative. What I'm going to ask Officer Sgrignoli is were his actions, [Victim's] actions, after the blood loss, consistent with a person who may be in shock and do those symptoms include a lack of cooperation, if you will.

[The Court]: All right. The objection is overruled.

(Discussion at sidebar concluded.)

[Commonwealth]: All right. Officer Sgrignoli, let me pick up where I left off. So with regard to the amount of blood loss that [Victim] suffered that you witnessed, could that amount of blood loss induce a person into shock?

[Officer Sgrignoli]: Yes, I believe so.

[Commonwealth]: So what kinds of things does a person in shock – when I say things, what actions or demeanors might a person exhibit who is in shock?

[Officer Sgrignoli]: They are differently [sic] going to have an altered mental status.

[Commonwealth]: What does that mean?

[Officer Sgrignoli]: They are not going to be conscious and alert to a person, place, time and the event that happened.

[Commonwealth]: And is that how [Victim's] demeanor was at the time?

[Officer Sgrignoli]: Yes.

N.T., 6/5/17, at 47-50.

Appellant argues that "[t]he Commonwealth asked question[s] regarding the officer's background, specialized knowledge, and experience he

gained in his previous employment as an [EMT]" in order to obtain his opinion on the behavior of individuals who go into shock. Appellant's Brief at 15. The Commonwealth allegedly did so to "rebut Appellant's argument that [Victim] was combative.[10] Appellant's defense at trial was one of self-defense; thus, an expert opinion offering an explanation as to why [Victim] was combative likely swayed the jury into disbelieving Appellant's assertion [of] self-defense." *Id.* at 20.

Pennsylvania Rule of Evidence 701 provides that if a witness is testifying as a lay witness, opinion testimony is limited to that which is:

> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

Conversely, where a witness is qualified as an expert, he or she may form an opinion based upon:

> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

---

[10] *See* supra note 4. As noted above, Appellant's trial counsel did not use the term "combative" to describe Victim. Rather, the Commonwealth argued for the admissibility of the testimony regarding shock on the basis that defense counsel "ha[d] made statements that part of his defense is that [Victim] is combative." N.T., 6/5/17, at 49.

  (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

  For example, in **_Commonwealth v. Rose_**, 172 A.3d 1121, 1131 (Pa. Super. 2017), a police officer was permitted to testify as a lay witness as to the meaning of "street lingo" in conversations of which he did not have personal knowledge, nor had he observed or participated in them. **_Id._** (noting that "lay testimony is intended to describe something that jurors otherwise had not been able to experience for themselves, by drawing upon the sensory and experiential observations that the witness made firsthand"). This Court determined that it was error for the trial court to permit this type of opinion testimony without qualifying the officer as an expert. **_Id._**

> In the event of an erroneous admission of evidence, a verdict can still be sustained if the error was harmless. . . . Harmless error exists if . . . the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.

**_Id._** (citations and quotation marks omitted).

  Here, the facts of **_Rose_** are similar to the instant matter, where an officer was permitted to offer an opinion as to a medical condition, something outside the knowledge or observations of a layperson, without being qualified as an expert. **_See_** Pa.R.E. 701. Officer Sgrignoli was not qualified as an expert witness, yet he gave an opinion regarding whether it was possible that Victim suffered from shock based upon the amount of blood he lost. This testimony was not within the knowledge or experience of a layperson. **_See_**

*Rose*, 172 A.3d at 1131. Accordingly, we find that the trial court erred in permitting Officer Sgrignoli to testify to his opinion regarding Victim potentially being in shock. *See id.*

Next, we turn to whether the error in permitting Officer Sgrignoli's testimony was harmless. *See id.* Here, in the context of all of the evidence adduced at trial, the testimony regarding shock was *de minimis*. There was no evidence that Victim was uncooperative or combative after the altercation with Appellant. Indeed, the only evidence of Victim's behavior after the fight was that he was unconscious when officers first arrived and unresponsive to attempts to talk to him. N.T., 6/5/17, at 29, 43. Furthermore, the severity of Victim's injuries were not in dispute at trial. Thus, Officer Sgrignoli's testimony that Victim's "demeanor" was consistent with a person in shock due to the loss of blood did not unduly prejudice the jury's ability to consider Appellant's claim of self-defense and could not have contributed to the verdict as a whole. Accordingly, we conclude that the error in admitting Officer Sgrignoli's opinion testimony regarding shock without qualifying him as an expert was harmless error.[11] *Id.*

---

[11] In its Rule 1925(a) opinion, the trial court indicated that allowing Officer Sgrignoli to testify regarding the effects of an individual going into shock was not an error and in any event harmless because the officer could have been qualified as an expert. Trial Ct. Op., 1/9/18, at 10-11. We note that we are "not bound by the rationale of the trial court, and we may affirm the trial court on any basis." *Commonwealth v. Williams*, 73 A.3d 609, 617 n.4 (Pa. Super. 2013) (citation omitted).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/17/2018