J-A11009-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                          :               PENNSYLVANIA
                                            :

             v.                             :
                                            :

JARVIS E. ROBERTS                :
                                            :

           Appellant          :    No. 1588 MDA 2024

Appeal from the Judgment of Sentence Entered August 30, 2024
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0000416-2019

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:          **FILED MAY 13, 2025**

Jarvis E. Roberts (Appellant), *pro se*, appeals from the judgment of sentence imposed after a jury convicted him of two counts of witness intimidation.[1] We affirm.

On the evening of November 27, 2016, Jose Gavilanes (Jose) sat in his vehicle, which was parked outside his mother's residence on North 2nd Street in Reading, Pennsylvania. N.T., 3/5-6/24, at 5-6. Jose was talking on the phone when he heard multiple gunshots behind him. *Id.* at 7. He saw a dark sedan approach from the rear and stop near his vehicle. *Id.* A tall individual exited the sedan and threw an object into a bush across the street. *Id.* at 8.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 4952(a)(2).

The individual got back into the sedan and drove off. *Id.* at 8-9. Jose approached the bush and saw a handgun, as well as a trail of blood where the individual had walked. *Id.*

Shortly thereafter, police responded to a 911 call placed by Appellant. Trial Court Opinion, 12/11/24, Exhibit A (Suppression Court Opinion (No. CP-06-CR-4876-2017), 1/8/19, at 2). At the corner of North 2nd Street and Windsor Street, police encountered a dark sedan riddled with bullet holes, in which Appellant, the sole occupant, was suffering from multiple gunshot wounds. *Id.*

Jose, who had also called 911, spoke to police and alerted them to the handgun and the blood trail. N.T., 3/5-6/24, at 10-11. Later that night, Jose gave an interview at the police station. *Id.* at 11. After obtaining a sample of Appellant's DNA via a search warrant, police confirmed that the blood Jose had observed was Appellant's blood. *See* Trial Court Opinion, 12/11/24, Exhibit A at 2; *see also* N.T., 10/20/22, Exhibit C-1 (Affidavit of Probable Cause, No. CP-06-CR-4876-2017) at 11.

The Commonwealth subsequently charged Appellant with one count of persons not to possess firearms,[2] at docket No. CP-06-CR-4876-2017 (the firearm case). The Commonwealth alleged Appellant was prohibited from possessing a firearm due to a prior conviction in New York for criminal

---

[2] 18 Pa.C.S.A. § 6105(a)(1).

possession of a loaded firearm.[3]  **See** Trial Court Opinion, 12/11/24, at 3. Jose testified at Appellant's preliminary hearing, and at a suppression hearing on November 16, 2018.  **Id.**  Appellant was represented by private counsel at this time.[4]

On December 15, 2018, Appellant appeared at the residence of Jose's mother, Gladys Carbo (Ms. Carbo).  N.T., 3/5-6/24, at 58-60.  When Ms. Carbo answered the door, Appellant asked if Jose was there.  **Id.** at 58.  Ms. Carbo indicated Jose was not there and asked what Appellant wanted.  **Id.**  Appellant stated Jose was a liar and had lied in court.  **Id.**  Ms. Carbo observed that Appellant was "very upset," "had an attitude," and banged on a clipboard he carried.  **Id.** at 60.  In the five-minute exchange, Appellant repeatedly insisted Jose was a liar.  **Id.** at 60-62.

Later the same day, Appellant contacted Jose's brother, Christopher Gavilanes (Christopher), via Facebook Messenger.  **Id.** at 39-42.  Appellant asked if Christopher knew how Appellant could contact Jose, asserted Jose had lied in court, and stated that Appellant wanted Jose to tell the truth.  **Id.**, Commonwealth Exhibit 1.

---

[3] **See** N.Y. Penal Law § 265.03.

[4] As discussed further *infra*, Appellant was represented by counsel in the firearm case and the instant case until December 20, 2021, when he began acting *pro se*.

- 3 -

Ms. Carbo and Christopher reported Appellant's actions to the police. The Commonwealth subsequently charged Appellant, at the instant docket, with two counts each of witness intimidation and harassment.[5] *See* Information, 2/19/19. The instant case was initially consolidated with the firearm case.

Following proceedings not relevant to our disposition, on December 20, 2021, the trial court granted Appellant's counsel leave to withdraw from representation at both dockets. *See* N.T., 12/20/21, at 11. Counsel indicated he and Appellant "had reached an impasse where there were some things that [Appellant] would like me to file which I didn't believe w[ere] supported by the facts and the law." *Id.* at 2. Specifically, Appellant wanted counsel to raise claims of prosecutorial misconduct relating to an alleged *Brady*[6] violation; counsel believed the *Brady* issue had been cured and "nothing untoward went on." *Id.* at 10.[7] After a colloquy, Appellant confirmed his desire to represent himself. *Id.* at 11-15.

_____

[5] 18 Pa.C.S.A. § 2709(a)(3).

[6] *Brady v. Maryland*, 363 U.S. 83 (1963).

[7] As discussed further *infra*, our review discloses the *Brady* issue involved the firearm case, not the instant case. In the firearm case, the Commonwealth failed to disclose to Appellant a police video interview with Jose until after the trial court had denied Appellant's suppression motion. *See* Trial Court Opinion, 12/11/24, Exhibit C (trial court's January 19, 2022, order in the firearm case). After Appellant filed a counseled motion for reconsideration of the suppression ruling, the trial court reconsidered the suppression issue and
*(Footnote Continued Next Page)*

Following additional proceedings,[8] the instant case was bifurcated for trial. A jury trial in the instant case commenced on March 5, 2024. Before trial, Appellant executed a waiver of counsel, reaffirming his desire to represent himself. *See* Waiver of Counsel, 3/5/24.[9] On March 6, 2024, the jury convicted Appellant of both counts of witness intimidation, while the trial

_____

reviewed the video interview. *Id.* "Had the video interview been disclosed prior to the original [suppression] hearing," the trial court concluded, "the result of the proceeding would not have been different." *Id.* The trial court further determined no *Brady* violation occurred. *Id.*

[8] On December 22, 2021, Appellant filed a motion to dismiss the charges at both dockets on grounds of, *inter alia*, a *Brady* violation, prosecutorial misconduct, and ineffective assistance of Appellant's counsel. The trial court denied the motion; Appellant appealed; and this Court quashed the appeals as interlocutory. *See* Orders, 3/14/22 (219 MDA 2022, 220 MDA 2022). After the trial court denied a substantially similar motion to dismiss, Appellant again appealed, and we again quashed the appeals. *See* Orders, 7/1/22 (975 MDA 2022, 976 MDA 2022). Appellant filed a flurry of additional motions in the trial court, including motions for the judge to recuse himself at both dockets. When the trial court denied the recusal motions, Appellant again appealed, and we again quashed the appeals. *See* Orders 1/31/23 (1509 MDA 2022, 1510 MDA 2022); *see also Commonwealth v. Roberts*, 303 A.3d 706 (Pa. 2023) (denying petition for allowance of appeal from 1509 MDA 2022); *Commonwealth v. Roberts*, 303 A.3d 707 (Pa. 2023) (denying petition for allowance of appeal from 1510 MDA 2022).

[9] In connection with Appellant's first interlocutory appeal, the trial court determined Appellant was not financially eligible for court-appointed counsel. *See* Order, 3/2/22. In connection with Appellant's second interlocutory appeal, the trial court noted Appellant had not requested court-appointed counsel nor sought reconsideration of his financial eligibility, and had not indicated any change in his financial circumstances. *See* Order, 8/1/22. After Appellant filed his third interlocutory appeal, the trial court advised him "of his right to reapply for Public Defender services if any of his financial circumstances have changed." Order, 10/31/22. Our review discloses Appellant thereafter made no effort to obtain counsel.

court acquitted him of both counts of harassment. On August 30, 2024, the trial court imposed a sentence of 1 to 22 months' imprisonment, followed by 2 years' probation.[10]

Appellant filed a timely post-sentence motion, which the trial court denied. Appellant timely appealed. Appellant timely filed a court-ordered Pa.R.A.P. 1925(b) concise statement, and the trial court filed an opinion in accordance with Pa.R.A.P. 1925(a).

Appellant identifies thirteen issues for our review:

1. Did the Commonwealth prove every element of [witness intimidation under] 18 Pa.C.S.A. § 4952(a)(2)[,] beyond a reasonable doubt?

2. [Does] asking a witness, who has previously given false testimony, to tell the truth in court [constitute] witness intimidation?

3. Did the Commonwealth violate the [trial court's] sequestration order?

4. Was [A]ppellant offered any relief after the court's sequestration order was violated?

5. Does the trial court have subject matter jurisdiction when there is no crime?

6. Does the prosecutor have legal authority to pursue charges when there is no crime?

---

[10] In September 2024, the Commonwealth withdrew the firearm case. **See** Trial Court Opinion, 12/11/24, at 3. "[U]pon review of its case for trial, the Commonwealth determined that the statute [forming] the basis of [Appellant's] prior conviction in New York state was not substantially similar to any Pennsylvania statute[,] and therefore no statutory disqualifier to [firearm] possession under 18 Pa.C.S.A. § 6105(a)(1) existed." **Id.** at 3-4.

7. Can [a defendant] obstruct justice when the prosecutor has no legal authority to prosecute?

8. Did the statute of limitations expire in the [firearm] case prior to the witness intimidation charge?

9. Did the prosecutor withhold exculpatory evidence in the [firearm] case?

10. Did the prosecutor elicit false testimony in the [firearm] case?

11. Did the Commonwealth's witness commit perjury in the [firearm] case?

12. Did defense counsel have a duty to investigate if the [firearm] offense was a crime?

13. Did [A]ppellant have effective assistance of counsel?

Appellant's Brief at 4-5 (issues reordered).

Preliminarily, we observe that "[a]lthough this Court is willing to construe liberally materials filed by a *pro se* litigant, a *pro se* appellant enjoys no special benefit." **Commonwealth v. Westlake**, 295 A.3d 1281, 1286 n.8 (Pa. Super. 2023) (citation omitted). "To the contrary, any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal training will be his undoing." **Commonwealth v. Vurimindi**, 200 A.3d 1031, 1037 (Pa. Super. 2018) (citation omitted). *Pro se* litigants "must comply with the procedural rules set forth in the Pennsylvania Rules of Court; if there are considerable defects [in an appellant's brief], we will be unable to perform appellate review." **Id.** at 1038 (citation omitted); **see also** Pa.R.A.P. 2101 (if the defects in an appellant's brief "are substantial, the appeal … may be quashed or

dismissed."). "This Court will not act as counsel and will not develop arguments on behalf of an appellant." ***Commonwealth v. Tchirkow***, 160 A.3d 798, 804 (Pa. Super. 2017) (citation omitted).

We first address Appellants' compliance with our appellate rules. Pa.R.A.P. 2119(a) provides that

> [t]he argument [section of an appellant's brief] shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein….

Pa.R.A.P. 2119(a). Appellate arguments which fail to adhere to these rules may be considered waived. ***Tchirkow***, 160 A.3d at 804.

Here, Appellant's brief identifies thirteen issues, but his argument is divided into only seven parts. ***See*** Appellant's Brief at 4-5, 8-28. These seven parts correspond with Appellant's Rule 1925(b) concise statement, which identified seven issues. ***See*** Appellant's Rule 1925(b) Statement, 10/29/24; ***see also*** Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge."); ***id.*** (b)(4)(vi) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."). Appellant's thirteen issues appear to be subsidiary arguments regarding the seven issues identified in his concise statement. ***See id.*** (b)(4)(v) ("Each error identified in the Statement will be deemed to include every subsidiary issue that was raised in the trial court."). Rather than deem Appellant's issues waived for his noncompliance with Rules

1925 and 2119, we will consider several of his thirteen issues together, considering them as sub-issues of the seven issues identified in Appellant's concise statement and delineated as the seven parts of his appellate argument.

In his first and second issues, Appellant argues the evidence was insufficient to sustain his convictions. *See* Appellant's Brief at 8-15. Appellant contends Jose "knowingly gave false testimony at [Appellant's] suppression hearing" in the firearm case. *Id.* at 8. Appellant maintains that on December 15, 2018, Appellant "attempted to contact Jose [] to ask him to tell the truth in court. Asking a witness who has previously given false testimony in court to tell the truth is not witness intimidation." *Id.* at 10. Appellant asserts he "made no explicit or implicit threats," and that "there was no coercion or inducement to act or refrain from acting, no offer of pecuniary benefit, and no abusive conduct or underlying violence." *Id.* at 11. Appellant argues the Commonwealth "presented facts that [Appellant] attempted to contact [Jose], and Appellant asked that [Jose] tell the truth in court. Those facts do not prove [witness intimidation under] 18 Pa.C.S.A. [§] 4952(a)(2)." *Id.* at 14.

"Whether sufficient evidence exists to support the verdict is a question of law; our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Beauchamps*, 320 A.3d 717, 721 (Pa. Super. 2024) (citation omitted). In reviewing a sufficiency claim, we must determine

> whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the

> Commonwealth as verdict-winner, [is] sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these principles, ***we must review the entire record and consider <u>all</u> of the evidence introduced.***

***Commonwealth v. Rojas-Rolon***, 256 A.3d 432, 436 (Pa. Super. 2021) (citation omitted; emphasis added).

Instantly, we are unable to consider **all** of the evidence introduced at trial, as Appellant did not request transcription of the entire trial proceeding. Appellant only requested transcription of the testimony of four Commonwealth witnesses: Jose, Christopher, Ms. Carbo, and Reading Police Officer Diego Arciniegas. ***See*** Transcript Request, 9/3/24; ***see also*** N.T., 3/5-6/24, at 4 ("As per the Order for Transcription, this transcript only contains the testimony of" the four above witnesses). We note that just before the transcribed portion of the trial ends, the Commonwealth called another witness, Reading Police Detective Michael Perkins. ***Id.*** at 73. The certified record does not include Detective Perkins's testimony, and we are unable to discern whether any other witness testimony or exhibits are also missing.

"The fundamental tool for appellate review is the official record of the events that occurred in the trial court. … The law of Pennsylvania is well

- 10 -

settled that matters which are not of record cannot be considered on appeal."

***Commonwealth v. Preston***, 904 A.2d 1, 6 (Pa. Super. 2006) (citations omitted). "This Court cannot meaningfully review claims raised on appeal unless we are provided with a full and complete certified record." ***Id.*** at 7 (citation omitted).

> We emphasize that
>
> it is the appellant's burden to ensure that the certified record contains that which is necessary for this Court to properly resolve the issues raised on appeal, including any transcripts. ***See Commonwealth v. Midgley***, 289 A.3d 1111, 1120 (Pa. Super. 2023). When the appellant fails to take the proper steps required for the preparation of transcripts, our Rules of Appellate Procedure allow for this Court to take any appropriate action, including dismissing the appeal in its entirety. ***See*** Pa.R.A.P. 1911(d).

***Commonwealth v. Schifano***, 310 A.3d 769, 772 (Pa. Super. 2024); ***see also*** Pa.R.A.P. 1911(d) ("If the appellant fails to take the action required by these rules and the Pennsylvania Rules of Judicial Administration for the preparation of the transcript, the appellate court may take such action as it deems appropriate, which may include dismissal of the appeal.").

> With regard to missing transcripts, the Rules of Appellate Procedure require an appellant to order and pay for any transcript necessary to permit resolution of the issues raised on appeal. Pa.R.A.P. 1911(a). … When the appellant … fails to conform to the requirements of Rule 1911, any claims that cannot be resolved in the absence of the necessary transcript or transcripts must be deemed waived for the purpose of appellate review.

***Preston***, 904 A.2d at 7.

Here, we cannot review whether "all of the evidence introduced" at trial is sufficient to sustain Appellant's convictions. ***Rojas-Rolon***, 256 A.3d at

436; *see also Preston*, 904 A.2d at 7. We nevertheless decline to find Appellant has waived his sufficiency challenge under Rule 1911. Neither the Commonwealth nor the trial court has raised an issue regarding the incomplete transcript in relation to Appellant's sufficiency claim, and neither refers to any witnesses beyond those whose testimony is transcribed. *See generally* Commonwealth Brief; Trial Court Opinion, 12/11/24. Appellate review is not substantially impeded because, as set forth *infra*, our review of the transcribed testimony discloses that the Commonwealth presented sufficient evidence to sustain Appellant's convictions. However, we caution appellants against the disingenuity of asserting the Commonwealth's evidence was insufficient, while failing to provide this Court with a complete record of that evidence.

Instantly, the Commonwealth charged Appellant with witness intimidation under 18 Pa.C.S.A. § 4952(a)(2), which provides as follows:

> **(a) Offense defined.**--A person commits an offense if, with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he intimidates or attempts to intimidate any witness or victim to:
>
> ***
>
> (2) Give any false or misleading information or testimony relating to the commission of any crime to any law enforcement officer, prosecuting official or judge.

18 Pa.C.S.A. § 4952(a)(2).

Regarding intimidation, our Supreme Court has observed that "proof of manifest threats is not required." *Commonwealth v. Doughty*, 126 A.3d 951, 957 (Pa. 2015).

> Clearly, intimidation may be accomplished with no words at all, for a mere look or posture can bully, threaten, coerce, frighten, or intimidate beyond question. *See*, *e.g.*, Clint Eastwood. It is equally true that an offer of benefit can be presented in such a Machiavellian manner as to contain an unarticulated act of intimidation. *See*, *e.g.*, The Godfather (Paramount Pictures 1972) ("I'm gonna make him an offer he can't refuse."). Indeed, one need not go to the movies to understand that people may purposely intimidate in any number of ways, without manifesting bullying or fearsome words, and if they do so with the requisite *mens rea*, the crime is made out.

*Id.*

> Moreover, this Court has observed that

> [a]ctual intimidation of a witness is not an essential element of the crime. The crime is committed if one, with the necessary *mens rea*, "attempts" to intimidate a witness or victim. The trier of the facts, therefore, could find that [a defendant] attempted to intimidate [a witness] and that he did so intending or, at least, having knowledge that his conduct was likely to, impede, impair or interfere with the administration of criminal justice. The Commonwealth is not required to prove *mens rea* by direct evidence. Frequently such evidence is not available. In such cases, the Commonwealth may rely on circumstantial evidence.

*Commonwealth v. Beasley*, 138 A.3d 39, 48 (Pa. Super. 2016) (ellipses omitted) (quoting *Commonwealth v. Collington*, 615 A.2d 769, 770 (Pa. Super. 1992)); *see also Commonwealth v. Baker*, 313 A.3d 1112, 1117 (Pa. Super. 2024) ("Actual intimidation is not required; the Commonwealth may prove an attempt to intimidate." (citation omitted)). The Crimes Code provides that a person "commits an attempt when, with intent to commit a

specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a).

Here, our review discloses that Jose testified at trial regarding his observations on November 27, 2016. N.T., 3/5-6/24, at 5-11. Jose stated that after he saw the individual discard the handgun, the individual reentered the sedan and drove off. *Id.* at 8-9. On cross-examination, Appellant attempted to impeach Jose regarding his prior testimony in the firearm case. *See id.* at 13-22. Jose confirmed that, at the November 16, 2018, suppression hearing, he testified that after he saw the individual reenter the sedan, he observed the sedan drive through a stop sign, swerve, and crash. *Id.* at 16; *see also id.* at 17 (Jose agreeing that, on the night of the November 2016 incident, he "might have" told police he saw the sedan crash). Jose also confirmed that, in his current trial testimony, he did not testify he saw the sedan crash. *Id.* at 16.

Jose explained that his suppression hearing testimony accurately reflected his memory at the time, but that he no longer remembered seeing the sedan crash. *Id.* He further confirmed that, at a December 14, 2023, hearing,[11] he testified that he did not see the sedan crash. *Id.* at 19, 21. Jose stated his "memory was better" when he initially testified that he did see

_____

[11] The December 14, 2023, hearing involved Appellant's "Motion to Dismiss for Malicious Prosecution, Prosecutor Overreaching, and Political Corruption," filed at both dockets on April 18, 2022. *See* Order, 12/20/23 (denying the motion).

the sedan crash. *Id.* at 22; *see also id.* (Jose testifying, "We're talking about [an incident in] 2016. And now we're talking [about my memory] in 2024 and 2023."). On redirect, Jose confirmed that any differences in his prior testimony resulted from "a gap in memory" rather than "deliberate[] lying." *Id.* at 24-25. Jose additionally confirmed Appellant never confronted him personally, threatened him, or asked him to give false or misleading testimony. *Id.* at 13, 23.

Ms. Carbo testified that she was home alone on December 15, 2018, when Appellant knocked on her door.[12] *Id.* at 58-60. She had never seen Appellant before and initially thought he was a Jehovah's Witness, because Jehovah's Witnesses frequently knocked on her door. *Id.* at 58-59. When Ms. Carbo answered the door, Appellant asked her if Jose was there. *Id.* at 58. She stated Jose was not there and asked why Appellant was looking for him. *Id.* Appellant told Ms. Carbo he wanted to speak with Jose, and that Jose "was a liar and had come [] to court to lie." *Id.* Ms. Carbo testified she "got very nervous and … very worried." *Id.* at 58-59. She stated Appellant "was very upset" and "had an attitude." *Id.* at 60. She testified Appellant had a clipboard with papers on it, and "kept on banging the clipboard with his hand," pointing at it, and "indicating that my son had lied [in] court." *Id.*

---

[12] Jose described the residence as his mother's house, but Ms. Carbo testified that Jose also lived there. *See* N.T., 3/5-6/24, at 6, 65.

Ms. Carbo testified that she understands "a little bit" of English,[13] and was able to understand "some" of what Appellant said to her. *Id.* at 61. She understood that Appellant asked if Jose was there, and repeatedly stated Jose was a liar. *Id.* at 61-62. Ms. Carbo testified that, throughout the five-minute encounter, Appellant "kept on being upset and saying my son lied in the court." *Id.* at 62. After Appellant left, Ms. Carbo called Jose. *Id.*

Ms. Carbo testified that the incident made her very nervous because she "started thinking this man's very upset with Jose, and he was talking about court." *Id.* She stated that "since then, I have not been able to have a peaceful life. I've been very sick this whole time because … I think they can hurt my child." *Id.* at 59. She testified that since the incident,

> I am afraid of going … out. I've lost my freedom. I feel like somebody's going to kill me. … Before I used to … walk a lot. … I am taking too many pills, too many antidepressants. … It got really bad after [the incident]. I started, then, having issues with my heart, with my blood pressure, with depression, with nerves, and diabetes.

*Id.* at 63. Ms. Carbo confirmed she no longer goes for walks, and testified she lost "[her] health, [her] tranquility, everything." *Id.* at 64; *see also id.* at 68 (Ms. Carbo testifying, "I don't sleep. … I am very upset all the time. I have to put a pill underneath my tongue because I could have a heart attack. I'm not at peace.").

---

[13] Ms. Carbo testified through a Spanish-language interpreter. *See* N.T., 3/5-6/24, at 57-58.

On cross-examination, Ms. Carbo confirmed Appellant did not threaten her. *Id.* at 67. When Appellant asked Ms. Carbo whether he threatened Jose, she stated, "No. Well, but what made me fearful is that he told me Jose was a liar; and that he was banging his clipboard; and that he had an attitude; and he was upset." *Id.* (punctuation modified). Ms. Carbo asked Appellant, "Do you know what it is to be in your house as if it was a prison where you cannot even walk to the corner, sir?" *Id.* at 68. Appellant responded that he himself had been the victim of a crime, and the following exchange ensued:

> [Appellant:] What crime were you the victim of?
>
> [Ms. Carbo:] Because I don't have my freedom anymore.
>
> [Appellant:] What crime were you the victim of?
>
> [Ms. Carbo:] That you went to my house and took away my peace, and I am so sick and so nervous.
>
> [Appellant:] Have you seen me in six years?
>
> [Ms. Carbo:] No, I haven't seen you. But that stayed with me, that something can happen to me or to my children because if you went to look for Jose, there must have been motive.

*Id.* at 68-69.

Christopher testified that Appellant messaged him via Facebook Messenger on December 15, 2018. *Id.* at 39-40. Christopher had never met Appellant and was not friends with him on Facebook. *Id.* at 39. Christopher testified that he preserved screenshots of the conversation, which the Commonwealth published to the jury. *Id.* at 40-43; *see also id.*, Commonwealth Exhibit 1. The entire exchange reads as follows:

[Appellant:] Yo i got to talk to you.

[Christopher:] Who is this?

[Appellant:] It's the guy that Jose is testifying against. I got proof he lied on the stand. I just want him to tell the truth.

[Christopher:] What? Who is this? U didn't answer my question.

[Appellant:] Jose Gavilanes went to court and lied.

[Christopher:] Okay not my problem. I don't talk to him and if u have a problem with that take it up with the court okay.

[Appellant:] I just want him to tell the truth.

[Christopher:] Well u not getting nothing from me. I don't talk to him nor see him so what do I have to do with this?

[Appellant:] Didn't mean to bother you with it. I saw you was his family. You know how I can get a hold of him?

[Christopher:] U have no right texting me telling me things of that matter if u have evidence or proof of those types of allegations then use ur resources and do the proper steps and not to contact family. And no.

[Appellant:] I have every right it's my case.

[Christopher: Because] this again is not my problem and none of my business so please don't get me involved. [You] can contact the law enforcement if you have issues.

[Appellant:] The law is the ones telling him to lie.

[Christopher:] Yes but in state law u are not allowed to have contact with witness or defendant/family. I know bc I went to school for bar exam and I myself know how court work.

[Appellant:] It's against the law to ask someone to lie. [I'm] asking he tell the truth.

[Christopher:] So unless u wanna get more charges I suggest to leave me alone and again if u have proof contact ur lawyer. Again not my concern.

[Appellant:] You can't charge me with anything but I will leave you alone.

[Christopher:] Yes harassment and tampering in evidence also tampering on an open case. Look it up on the law books. Enough said.

[Appellant:] Perjury look that up. [I'm] not tampering I'm saying tell the truth.

*Id.*, Commonwealth Exhibit 1 (some punctuation added). Christopher confirmed that he received no further messages from Appellant, and had no contact with Appellant outside of Facebook Messenger. *Id.* at 45.

On cross-examination, Christopher confirmed that Appellant did not threaten him. *Id.* at 46, 52. Regarding whether Appellant asked Jose to give false or misleading testimony, the following exchange occurred:

[Appellant:] Did I ask Jose or you not to come to court or not to give any information?

[Christopher:] You said to tell the truth.

[Appellant:] To tell the truth?

[Christopher:] So, yes, that's implying.

[Appellant:] To say tell the truth means do not report any information?

[Christopher:] That's implying.

…

[Appellant:] Implying what?

[Christopher:] That's implying to withhold, withhold information…. When you tell somebody to tell the truth, you imagine they're not telling the truth or imagine they are telling the truth, so it's implying.

*Id.* at 48.

- 19 -

On redirect, Christopher confirmed that when he received Appellant's messages, he believed Appellant "was asking for Jose to change his testimony." *Id.* at 53. Asked why he thought Appellant sought Jose's whereabouts, Christopher testified, "Maybe it was going to be a conversation [between Appellant and Jose]; maybe it could have been more." *Id.*

In its Rule 1925(a) opinion, the trial court rejected Appellant's sufficiency challenge, reasoning as follows:

> [Appellant] became singularly focused on alleged inconsistencies in [Jose's prior] testimony which [Appellant] describes as "lies." However, … [t]he jury [is] the sole judge[] of credibility and [is] free to decide to believe all, part, or none of any testimony presented.
>
> [Appellant] aggressively pursued contact with Jose [] by appearing at his home [on December 15, 2018]. At the time, [Appellant] was represented by counsel. The [suppression motion in the firearm case] was still pending, [a ruling] not being issued until January 8, 201[9]. While [Appellant's] initial interaction with Ms. Carbo was innocuous, it quickly escalated to [Appellant] pounding on a clipboard and [making] irate animated hand gestures[,] scaring Ms. Carbo to the point [where she still suffers from] repercussions in 2024. When rebuffed, [Appellant] then contacted Christopher[,] asserting once again that his brother Jose had lied under oath. The communication was back-and-forth and confrontational in style. Christopher [] clearly indicated that [Appellant] should not be contacting [Jose's] family and suggested he contact his attorney instead.
>
> ***
>
> [Appellant] continues to argue that because he was asking for Jose [] to change his testimony to a version more in sync with [Appellant's] position, which [Appellant] asserts is "the truth," that he was not intimidating [Jose's] family. As evidenced by the verdicts, this argument was rejected by the jury, as the finder of fact. When viewed in the light most favorable to the

- 20 -

> Commonwealth, [the evidence is sufficient] to support the verdicts rendered.

Trial Court Opinion, 12/11/24, at 5-6 (footnotes omitted).

Our review confirms that the above-described evidence, "and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth," **Rojas-Rolon**, 256 A.3d at 436, sufficiently established that Appellant, acting with the requisite *mens rea*, attempted to intimidate Jose into giving false or misleading testimony in connection with the firearm case. **See** 18 Pa.C.S.A. § 4952(a)(2).

Appellant argues he threatened no one, but intimidation does not require an explicit threat. **Doughty**, 126 A.3d at 957. Appellant maintains he did not ask anyone to give false testimony, but an explicit request is not required. **Id.** Acting outside of proper legal channels, without the knowledge or assistance of his counsel, Appellant confronted Jose's family members and vehemently insisted that Jose change his testimony in a pending criminal case. Ms. Carbo made clear that Appellant's conduct left her terrified that Appellant would harm Jose or herself, while Christopher similarly believed Appellant may have sought out Jose for more than just a conversation. Jose's family members interpreted Appellant's conduct as an implied threat, and the jury could have reasonably made the same inference. Though Appellant did not succeed in reaching Jose directly, the evidence sufficiently established that Appellant attempted to intimidate Jose into changing his testimony.

The above evidence also sufficiently established that, in seeking to change Jose's testimony, Appellant sought to induce false or misleading testimony. Appellant points out that in his messages to Christopher, he stated, "I just want [Jose] to tell the truth." Commonwealth Exhibit 1. Appellant argues it is not "a crime to ask a witness to testify truthfully[.]" Appellant's Brief at 15. Appellant's argument, however, presupposes that the jury found Appellant's statement to Christopher to be credible. The jury was free to disbelieve that statement.[14] At the same time, the jury was free to believe Jose's testimony that his prior testimony had been true to the best of his recollection. The jury was free to infer that since Appellant sought to change Jose's testimony, he intended to change it to something less than truthful. Such an inference establishes not only the "false or misleading testimony" element of section 4952(a)(2), but also the *mens rea* element (acting "with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal

_____

[14] Appellant also told Christopher, "I got proof [Jose] lied on the stand," and that "[t]he law is the ones telling him to lie." Commonwealth Exhibit 1. We observe that Appellant does not direct our attention to any evidence adduced at trial that would substantiate either of these bold assertions. Appellant attempted to cast doubt on Jose's November 16, 2018, suppression hearing testimony only by comparing it with Jose's much later testimony from 2023-24. Appellant failed to identify any "proof" he possessed on December 15, 2018, that Jose had lied, much less any evidence that law enforcement had urged Jose to lie. Appellant's utter failure to substantiate these two assertions at trial would naturally impair the credibility of the statement ("I just want [Jose] to tell the truth") sandwiched between them.

justice"). 18 Pa.C.S.A. § 4952(a)(2). For this Court to accept Appellant's sufficiency argument, we would have to invade the jury's domain and impose our own credibility determinations; this we cannot do. *See Commonwealth. v. Tielsch*, 934 A.2d 81, 94 (Pa. Super. 2007) (rejecting a sufficiency claim premised on attacking a Commonwealth witness's credibility, "because a determination of credibility is within the sole province of the trier of fact, who is free to believe all, part or none of the evidence." (citations and quotation marks omitted)). Accordingly, Appellant's sufficiency claim merits no relief.

In his third and fourth issues, Appellant argues the Commonwealth violated a sequestration order during trial, and the trial court erred in failing to either declare a mistrial or issue some unspecified jury instruction. *See* Appellant's Brief at 26-27. We observe the following standard of review:

> Where violation of a sequestration order occurs, the remedy selected
>
>> is within the sound discretion of the trial court. In exercising its discretion, the trial court should consider the seriousness of the violation, its impact on the testimony of the witness, and its probable impact on the outcome of the trial. We will disturb the trial court's exercise of its discretion only if there is no reasonable ground for the action taken.
>
> *Commonwealth v. Smith*, 346 A.2d 757, 760 (Pa. 1975). "Additionally, the trial court should consider whether … the party calling the witness procured his disobedience." *Commonwealth v. Mokluk*, 444 A.2d 1214, 1216 (Pa. Super. 1982) (citation omitted). Further, "[a] mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Simpson*, 754 A.2d 1264, 1272 (Pa. 2000).

***Commonwealth v. Rose***, 172 A.3d 1121, 1127 (Pa. Super. 2017) (citations

modified).

Instantly, our review of the trial transcript discloses that Appellant

raised this issue before the trial court as follows:

> The Commonwealth witnesses were all in a room together [even though] witnesses are supposed to be sequestered. And then [the Assistant District Attorney] and Detective Perkins were also in the room with the witness that already testified previously [(Christopher)] and a witness that is about to testify [(Ms. Carbo)].

N.T., 3/5-6/24, at 55. The Assistant District Attorney responded:

> I did step out to let Ms. Carbo know that we would be taking the afternoon break now and that our intention was to call her shortly after that. She was sitting in a room with Ruthie Scott from [the District Attorney's Office,] who is a victim witness coordinator, and [also in the room was] Christopher …, who did just testify. I had directed them every time that we had prepped and earlier today, as well right now, that they are not to talk to each other about their testimony or anything that they reviewed.
>
> And I did ask Ms. Scott if they had been talking about that, and she had said no. So they know that they are not supposed to be talking about their testimony. I think Christopher just wanted to check on his mom. And they are now separate[d].

***Id.*** at 55-56 (some punctuation modified). Appellant then argued,

> [t]here has got to be some type of repercussions if the witnesses are supposed to be sequestered and they're all in the room together…. I don't know what was said in that room, Your Honor. For the record, I'm not even going to ask for a dismissal. But there has got to be some type of sanction or there has to be some type of penalty for having all of those witnesses together in the room … while trial was going on and we're at recess.

*Id.* at 56-57. The trial court stated, "Okay. I'll take that under consideration. We'll address it some time in the future." *Id.* at 57. At that point, Ms. Carbo was called to testify. *Id.*

The incomplete trial transcript contains no further mention of the sequestration issue. Moreover, the transcript does not contain the language of any sequestration order the trial court may have issued at the trial's outset. In addressing the sequestration issue in its Rule 1925(a) opinion, the trial court observed that "[t]he full trial was not requested to be transcribed and there is no record available as to any action taken by the court." Trial Court Opinion, 12/11/24, at 12. We cannot meaningfully review this issue on the record before us. Because Appellant failed to provide us with a complete record, we deem the issue waived under Rule 1911(d).[15] *See Preston*, 904 A.2d at 7.

In his fifth, sixth, and seventh issues, Appellant argues the trial court did not have subject matter jurisdiction over him in the instant case, because his alleged conduct in the firearm case did not constitute a crime. Appellant's Brief at 15-18. Appellant notes that, after trial concluded in the instant case,

_____

[15] If not waived, the issue would merit no relief. The trial court stated Appellant failed to challenge the Assistant District Attorney's representation that the witnesses did not discuss their testimony. Trial Court Opinion, 12/11/24, at 12. The trial court determined the sequestration violation was inconsequential; Appellant suffered no prejudice; and no relief was warranted. *Id.* The record before us contains no basis for disturbing the trial court's exercise of discretion. *See Rose*, 172 A.3d at 1127.

- 25 -

the Commonwealth withdrew the firearm case, because Appellant's prior New York conviction was not equivalent to any of the Pennsylvania offenses which result in the prohibition against possessing a firearm under 18 Pa.C.S.A. § 6105. *Id.* at 16; *see also* n.10 *supra*. Appellant asserts he was "charged with [the firearm] offense that was not a crime," then "charged with witness intimidation for obstructing the non-criminal offense." Appellant's Brief at 17. Appellant maintains "the trial court [does not] have jurisdiction over an offense that is not a crime[.]" *Id.* Without citing any authority, Appellant asserts that

> [t]he lack of subject matter jurisdiction can be retroactively challenged. … [Appellant] should never have been charged with a crime. [Appellant] should have been free from any prosecution. Witness intimidation cannot survive without the underlying crime.

*Id.* at 17-18.

The trial court rejected Appellant's argument, noting that "[r]egardless of the ultimate outcome [in the firearm case], the charge was pending at the time of the events [forming] the basis of the [witness intimidation] charges…." Trial Court Opinion, 12/11/24, at 8. We agree with the trial court that Appellant's favorable outcome in the firearm case did not retroactively divest the trial court of jurisdiction over the instant case. As Appellant identifies no authority in support of his argument, these issues merit no relief.

In his eighth issue, Appellant asserts that the Commonwealth lacked authority to pursue the instant charges because the statute of limitations *in the firearm case* expired on November 27, 2018, two years after the

November 27, 2016, firearm incident. Appellant's Brief at 18-19. Appellant maintains he "should have been free from any prosecution or adjudication" after November 27, 2018.

As the trial court correctly observed, witness intimidation carries a five-year statute of limitations. Trial Court Opinion, 12/11/24, at 8 (citing 42 Pa.C.S.A. § 5552(b)(1) ("A prosecution for," *inter alia*, witness intimidation under 18 Pa.C.S.A. § 4952, "must be commenced within five years after it is committed.")). The witness intimidation incidents occurred on December 15, 2018. The Commonwealth filed the instant charges three days later, on December 18, 2018, well within the applicable statute of limitations. Appellant cites no legal authority supporting his argument, which amounts to the absurd proposition that criminal defendants are free to intimidate witnesses so long as the statute of limitations for the underlying offense has expired. Appellant's eighth issue merits no relief.

In his ninth and tenth issues, Appellant maintains the Commonwealth committed a **Brady** violation and engaged in prosecutorial misconduct **in the firearm case**. Appellant's Brief at 19-23; **see also** n.7 **supra**. Appellant asserts the Commonwealth elicited false testimony from Jose at the November 16, 2018, suppression hearing, and failed to timely disclose impeachment evidence in the form of a video interview. Appellant's Brief at 19-23. Appellant fails to connect this alleged misconduct with the instant case, baldly asserting, without explanation or citation to authority, that the instant "docket

is the result of the misconduct that occurred." *Id.* at 19. The trial court correctly determined that the *Brady*/misconduct issue involved only the firearm case and was addressed at that docket. Trial Court Opinion, 12/11/24, at 9. The trial court further observed that "[t]here was no delay in the disclosure of any evidence in the [instant case]." *Id.* Our review discloses that Appellant's ninth and tenth issues do not allege any trial court error *in the instant case*, and therefore merit no relief.

In his eleventh issue, Appellant argues Jose committed perjury *in the firearm case*. Appellant's Brief at 25-26. This issue merits no relief, as Appellant likewise fails to allege any trial court error *in the instant case*.

In his twelfth and thirteenth issues, Appellant argues his counsel rendered ineffective assistance *in the firearm case*. Appellant's Brief at 23-25. Appellant maintains his counsel failed to properly address the *Brady*/misconduct issue, and failed to investigate whether his New York conviction prohibited him from possessing a firearm under 18 Pa.C.S.A. § 6105. *Id.* Appellant makes no attempt to connect these complaints to the instant case, and his issues therefore merit no relief. *See* Trial Court Opinion, 12/11/24, at 10 (opining Appellant's ineffective assistance claim involves only the firearm case).

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/13/2025