J-S03041-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KUAMI WRIGHT | : | |
| | : | |
| Appellant | : | No. 1382 MDA 2024 |

Appeal from the Judgment of Sentence Entered February 14, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0002719-2023

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KUAMI ASHANTI WRIGHT | : | |
| | : | |
| Appellant | : | No. 1383 MDA 2024 |

Appeal from the Judgment of Sentence Entered February 14, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0005435-2021

BEFORE:  DUBOW, J., BECK, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: APRIL 10, 2026**

Kuami Ashanti Wright ("Wright") appeals, *pro se*, from the judgments of sentence imposed following his jury convictions, across two trial dockets for aggravated assault,[1] firearms offenses, and related offenses.  After careful review, we affirm.

---

[1] ***See*** 18 Pa.C.S.A. § 2702(a)(1), (4).

These consolidated matters arise from two shootings in Harrisburg in July and August 2021. The trial court summarized the trial evidence in detail. *See* Trial Court Opinion, 12/19/24, at 3-15. We need not recount that summary in full and instead set forth only those facts necessary to resolve the issues on appeal.

In July 2021, police responded to a report of a male shot near 20th and Market Streets. The victim, Kyrelle Quinn ("Quinn"), sustained multiple gunshots to his abdomen and leg, and survived. Officers recovered shell casings at the scene and discovered a blood trail extending several blocks. Police also obtained Ring camera surveillance footage depicting an individual raising and firing a handgun at Quinn's vehicle. The shooter appeared to have long black hair, arm tattoos, athletic-style pants, a light blue shirt bearing the word "vibes" in bright yellow lettering, and bright yellow sneakers. The shooter also drove a black Nissan Versa.

Detective Brian Carriere ("Detective Carriere") later identified Wright as the shooter from the surveillance video of the incident. He then began monitoring Wright's social media activity. Detective Carriere compared the surveillance images with photographs from Wright's Facebook posts, which depicted Wright wearing clothing consistent with that worn by the shooter shown in the Quinn surveillance footage.

While investigating the Quinn shooting, police learned of a second shooting that occurred in August 2021 near South 16th and Zarker Streets. The victim, Richard Ellis ("Ellis"), sustained gunshots to both legs and

survived. A witness directed police to the location from which the shooter fired, and officers recovered shell casings. Witness Evelyn McGhee ("McGhee") later identified Wright as the Ellis shooter through a photographic array. Detective Carriere recovered surveillance footage, which depicted the shooter wearing dark-colored sweatpants and driving a black Nissan Versa, similar to the vehicle observed in the Quinn shooting. Detective Carriere discovered additional social media posts depicting Wright wearing the same dark-colored sweatpants. Detective Carriere submitted ballistic evidence from both shootings for testing, which revealed that they were fired by the same firearm.

The Commonwealth charged Wright at two trial dockets, CP-22-CR-0005435-2021 ("Docket 5435") and CP-22-CR-0002719-2023 ("Docket 2719"), for the two shootings. In August 2023, the Commonwealth filed a notice of joinder seeking to consolidate the two dockets for trial. Wright moved for severance, to which the Commonwealth filed an answer. The trial court conducted a hearing and subsequently denied Wright's motion.

The case proceeded to a consolidated jury trial in December 2023. Prior to trial, Wright elected to proceed *pro se*, and the trial court appointed Jason Jefferis, Esquire ("Attorney Jefferis"), as standby counsel. Prior to opening statements, Wright asserted that the Commonwealth had not provided, in discovery, certain recorded prison calls, even though the Commonwealth had provided them to Wright's prior counsel one to two years earlier. The trial court addressed the issue on the record and ruled that the recordings were

admissible, as the Commonwealth "had a responsibility to turn it over to [defense] counsel at the time. They've done that." N.T., 12/11/23, at 19.

Next, outside the presence of the jury, the trial court advised Wright that, due to his *pro se* status, the court would not permit him to approach the bench for sidebar conferences. The trial court also noted that requiring sheriff's deputies to escort Wright to the bench for sidebar could undermine the presumption of innocence before the jury. The trial court then explained alternative procedures for discussions outside the jury's presence: (1) "allow [Attorney] Jefferis to come forward on [Wright's] behalf and participate, and [Attorney Jefferis] can report back[;]" or (2) "take a recess, have the jury leave, then have it on the record." *Id*. at 14. Wright did not object and the record reflects that the trial court followed both procedures on multiple occasions.

At trial, the Commonwealth presented evidence that police recovered shell casings from each crime scene. Firearms examiner Corporal David Turnbo ("Corporal Turnbo") testified that the same firearm fired the casings and bullets from both incidents.

Detective Ian Dawson ("Detective Dawson") testified that surveillance video from the Quinn shooting depicted a suspect with long black hair, wearing a blue "vibes" shirt and bright yellow sneakers, tattoos on the arms, and wearing athletic style pants. Social media posts showed Wright wearing similar clothing and displaying similar tattoos. Police later recovered bright

yellow FILA sneakers during a search of a hotel room where they arrested Wright.

McGhee testified that she witnessed Wright shoot Ellis following a parking dispute. She later identified Wright as the shooter through a photographic array and at trial. At the conclusion of the first day of proceedings, outside the presence of the jury, the trial court inquired how much additional questioning Wright intended to conduct of McGhee. The court suggested that Wright consider overnight whether further questioning was necessary and advised that he could either continue his cross-examination the following day or proceed to the next witness. Wright resumed his cross-examination of McGhee the next morning and continued questioning her at length.

Detective Carriere testified that he obtained surveillance footage from the Ellis shooting, which indicated that the shooter operated the same vehicle in both shootings. He further testified that Wright wore certain clothing in photographs and videos that he posted on Facebook and TikTok. According to Detective Dawson, that clothing matched both the attire of the person who shot Quinn and images of Wright associated with the shooting. Additionally, still images derived from surveillance footage of the Ellis shooting depicted the shooter wearing dark-colored sweatpants consistent with those that Wright also wore in his social media posts.

On cross-examination, Wright questioned Detectives Dawson and Carriere regarding the still images the Commonwealth derived from Facebook

and TikTok, as well as surveillance footage. Although Wright referenced a TikTok video during his cross-examination of both detectives, he neither moved to admit the video nor requested to publish it in its entirety.

On the second day of trial, the court heard argument on two witnesses' motions to quash Wright's subpoenas for them to testify. Saliently, Wright had subpoenaed, *inter alia*, vascular surgeon John Calaitges, M.D. ("Dr. Calaitges") to testify regarding Quinn's medical condition and treatment. When the trial court requested an offer of proof, Wright declined, stating, "I understand that the Commonwealth has a right to be here. I can't divulge those facts. I feel that I can't divulge those facts in the presence of the prosecution." N.T., 12/12/23, at 230. The Commonwealth offered to leave the courtroom, but the trial court noted that the courtroom was a public forum. The trial court then advised Wright that failure to make a proffer could result in waiver of the issue. Wright nevertheless declined to provide one.

Additionally, Wright did not dispute that Quinn had not executed a Health Insurance Portability and Accountability Act ("HIPAA") waiver or that compliance with the subpoena would impose an undue burden on the physician. In *lieu* of live testimony, the Commonwealth offered to stipulate to the authenticity of the relevant medical records. Following argument, the court granted the motions to quash the subpoenas and precluded the proposed testimony. Although the trial court indicated that Wright could revisit the matter at a later point, he did not renew the request.

The Commonwealth later presented Graham Lawrence, M.D. ("Dr. Lawrence"), who testified that Quinn suffered serious bodily injury that, if untreated, would have resulted in death. On cross-examination, Wright attempted to question Dr. Lawrence regarding findings contained in Dr. Calaitges' report. The Commonwealth objected on the grounds that the inquiry exceeded the scope of direct examination. The trial court sustained the objection and explained that Dr. Lawrence could testify to his own observations and notes but could not opine as to the conclusions reached by another physician, particularly where neither doctor was qualified as a pathologist to render forensic determinations regarding entry and exit wounds.

The Commonwealth also introduced recorded prison calls placed by Wright after his arrest, including a call in which Wright asked Quinn whether he was a "cheese-eater." N.T., 12/13/23, at 453. He also testified based on his experience that the term "cheese-eater" is slang for a snitch. Wright did not object but later attempted to introduce an alternative meaning for the term, "cheese-eater," through defense witness Shavar Thompson ("Thompson"). Thompson acknowledged that the term referred to a snitch, although he testified that, in this context, it meant someone who makes a false report.

On cross-examination, the Commonwealth questioned Thompson regarding the definition of "cheese-eater" at www.urbandictionary.com, a website that set forth definitions of street slang. Wright objected to the

Commonwealth's reliance on the website but acknowledged that "there are about 350 Urban Dictionaries . . . [i]t's not universal in any way, shape, or form." N.T., 12/14/23, at 796-97. The trial court responded that "[t]he factfinders will decide what value, if any, will be given[,]" explaining that the website was a publicly available source. *Id*. Thereafter, the trial court permitted questioning regarding the website.

The Commonwealth also elicited testimony that Thompson and Wright knew each other and were incarcerated together while Wright awaited disposition of the instant charges. Wright did not object contemporaneously to this testimony and instead moved for a mistrial after Thompson had completed his testimony, which the trial court denied.

Wright testified on his own behalf and denied involvement in the shootings. He challenged the Commonwealth's identification evidence, disputing that he was the individual depicted in the surveillance footage and in images taken from his own social media accounts, despite evidence that those images originated from accounts attributed to him.

At the conclusion of trial, the jury found Wright guilty of all charges at both dockets: aggravated assault — attempts to cause serious bodily injury with extreme indifference; aggravated assault — attempts to cause or cause bodily injury with a deadly weapon; firearms not to be carried without a license; and recklessly endangering another person. Separately, Wright entered pleas of *nolo contendere* to two counts of person not to possess firearms. On February 14, 2024, the trial court imposed an aggregate

sentence of fifty to one hundred years' imprisonment. Attorney Jefferis filed a timely post-sentence motion on behalf of Wright, which the trial court denied on April 11, 2024.

On July 24, 2024, Wright filed a *pro se* petition under the Post Conviction Relief Act[2] ("PCRA"), asserting that Attorney Jefferis had failed to file a direct appeal on his behalf. The court appointed Kristen Weisenberger, Esquire ("Attorney Weisenberger"), to represent Wright in the PCRA proceedings. Upon review, Attorney Weisenberger advised the trial court that Wright wished to proceed *pro se*. On August 19, 2024, the trial court conducted a ***Grazier***[3] hearing, determined that Wright's waiver of counsel was knowing, voluntary, and intelligent, and thus granted his request to proceed *pro se*. The Commonwealth agreed to the reinstatement of Wright's direct appeal rights, which the trial court granted.

Wright then filed a *pro se* notice of appeal. Both Wright and the trial court have complied with Pa.R.A.P. 1925. Wright filed a lengthy Pa.R.A.P. 1925(b) concise statement identifying thirty-three alleged errors. However, Wright has filed a *pro se* appellate brief in which he presents twenty issues in his "Statement of Questions Presented" (verbatim):

> I.   Did the [trial] court err in not ensuring that all [sidebar] discussions were on the record?

---

[2] ***See*** 42 Pa.C.S.A. §§ 9541-9546.

[3] ***See Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998).

II.     Did the [trial] court err in allowing the Commonwealth to inform the jury that [Wright] was incarcerated at time of trial[?]

III.    Did the [trial] court err in denying [Wright's] motion for severance?

IV.     Did the [trial] court err in harshly reprimanding [Wright] in the presence of the jury?

V.      Did [the trial] court err in allowing [the] Commonwealth to testify [*sic*] to heavily contested definitions from urban dictionary?

VI.     Did the [trial] court err in allowing stand-by counsel to act for [Wright] on matters of importance?

VII.    Did the [trial] court err in allowing the Commonwealth to use evidence not provided to [Wright] prior to trial?

VIII.   Did the [trial] court err in denying [Wright's] motion for mistrial?

IX.     Did the [trial] court err in granting [the] motion to quash [Wright's] subpoena of [Dr. Calaitges]?

X.      Did the [trial] court err in stating that relevant experts were not qualified to identify entry and exit wounds?

XI.     Did the [trial] court err in offering an opinion with regard to the perjury of [] McGhee?

XII.    Did the [trial] court err in offering an opinion on a heavily contested definition from urban dictionary?

XIII.   Did the [trial] court err in not allowing [Wright] to play a [T]iktok video?

XIV.    Did the [trial] court err in allowing the Commonwealth to offer argument, answer questions and testify during the cross-examination of [Wright]?

XV.     Did the [trial] court err in repeatedly interfering with[] the cross-examination of key Commonwealth witnesses?

XVI. Did the [trial] court err in [its] exercise of judicial notice?

XVII. Did the [trial] court err in sustaining an objection by the Commonwealth to [Wright's] asking a detective if he lied and allowing [C]ommonwealth to testify as to why detectives can lie?

XVIII.Did the [trial] court err in requiring [Wright] to disclose vital points of strategy during [the] hearing on motion to quash?

XIX. Did the [trial] court err in requiring [Wright] to "convince [the prosecutor]" that he should be allowed to continue cross examination?

XX. Did the [trial] court err where its overall displays of partiality, prejudice, bias, irrational rulings and rationale, actions and statements deprived [Wright] of a fair trial?

Wright's Brief at 3-4 (unnecessary capitalization omitted).[4]

Initially, we note:

As a prefatory matter, although this Court is willing to construe liberally materials filed by a *pro se* litigant, *pro se* status generally confers no special benefit upon an appellant. Accordingly, a *pro se* litigant must comply with the procedural rules set forth in the

---

[4] We note that Wright filed an application in this Court to exceed the word limitations in his appellate brief. **See** Pa.R.A.P. 2135(a) (providing that "[a] a principal brief shall not exceed 14,000 words"). This Court granted Wright's request and directed that his brief not exceed 18,000 words. In a footnote in his brief, Wright now asserts that this Court's order, limiting the size of his brief, forced him to exclude thirteen additional issues and that those issues are "available" to this Court "upon request." Wright's Brief at 4 n.1. However, issues not included in the brief and developed with argument are waived. **See** Pa.R.A.P. 2116(a) (requiring that the statement of questions involved concisely state the issues presented for review); 2119(a) (requiring that developed argument and citation to authority support each issue). Appellate briefing limitations do not relieve a litigant of the obligation to present and develop the issues raised on appeal, as compliance with the appellate rules governing briefing is mandatory, not a matter of mere stylistic preference. **See Commonwealth v. Sexton**, 222 A.3d 405, 416 (Pa. Super. 2019) (citation omitted).

> Pennsylvania Rules of the Court. This Court may quash or dismiss an appeal if an appellant fails to conform with the requirements set forth in the Pennsylvania Rules of Appellate Procedure. [*See*] Pa.R.A.P. 2101.

*Commonwealth v. Freeland*, 106 A.3d 768, 776–77 (Pa. Super. 2014) (some citations omitted).

"[T]he Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Commonwealth v. Neafie*, 341 A.3d 813, 817 (Pa. Super. 2025) (some citations omitted); *see also* Pa.R.A.P. 2119(a). It is well-settled that "[w]hen issues are not properly raised and developed in briefs, [and] when the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof." *Commonwealth v. Sanford*, 445 A.2d 149, 150 (Pa. Super. 1982) (citation omitted). Accordingly, where an appellant fails to provide any discussion of his issue on appeal, or case law supporting his right to relief, this Court will not address the issue on appeal. *See id*.

Wright's *pro se* brief fails to comply with several Rules of Appellate Procedure. Notably, Wright fails to comply with: (1) Pa.R.A.P. 124(a)(3), which requires double-spaced text; (2) Pa.R.A.P. 2111(a), which sets forth the required order and contents of an appellate brief; (3) Pa.R.A.P. 2119(a), which requires that each argument be supported by discussion and citation to pertinent authority; and (4) Pa.R.A.P. 2119(c), which requires citation to the record, where Wright makes only passing references to portions of the record.

- 12 -

The excessive length and formatting defects of Wright's brief unnecessarily impede our review. Furthermore, Wright does not organize his argument by issues; instead, he jumps from claim to claim and discusses some claims, to varying degrees, across multiple pages. Wright's lack of meaningful discussion further amplifies these defects. *See* Pa.R.A.P. 2119(a); *see also* Wright's Brief at 11-58. As a result, Wright's argument consists largely of disorganized and undeveloped assertions. Further, several of Wright's twenty questions are either duplicative or unsupported by developed argument and citation to authority.

We acknowledge that Wright proceeds *pro se* in this matter. However, "*pro se* status generally confers no special benefit upon an appellant. Accordingly, a *pro se* litigant must comply with the procedural rules set forth in the Pennsylvania Rules of the Court." *Freeland*, 106 A.3d at 776–77. It is not the role of this Court to develop arguments on his behalf. Although these violations could warrant dismissal of the appeal, we decline to impose that sanction and instead address the issues that we can reasonably discern from Wright's brief.

Preliminarily, we observe that Wright fails to develop any meaningful argument with respect to issues XVI and XVIII, which allegedly challenge judicial notice and the trial court's requirement to disclose his defense strategy with regard to the motions to quash his witness subpoenas. Accordingly, Wright has waived those claims. *See* Pa.R.A.P. 2119(a); *see also Sanford*, 445 A.2d at 150.

We address Wright's remaining claims as follows: (1) challenges to evidentiary rulings; (2) the denial of severance; (3) the granting of the motion to quash the subpoenas and the limitation of expert testimony; (4) limitations on cross-examination; (5) references to Wright's incarceration and the denial of a mistrial; (6) sidebar discussions not placed on the record; and (7) judicial bias and cumulative error.

In his first issue, Wright argues that the trial court abused its discretion in certain evidentiary rulings, including permitting testimony concerning slang terminology, admitting recorded prison calls allegedly not disclosed prior to trial, and limiting Wright's attempt to introduce a social media video during cross-examination.

It is well-settled:

> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

**Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015) (quotation marks and citations omitted).

A trial court also has discretion to control the mode and order of examining witnesses and presenting evidence

so as to:

(1) make the procedures effective for determining the truth; [and]

(2) avoid wasting time[.]

Pa.R.E. 611(a)(1)-(2). In addition, "the trial court has broad discretion regarding both the scope and permissible limits of cross-examination." *Commonwealth v. Rosser*, 135 A.3d 1077, 1087 (Pa. Super. 2016) (*en banc*) (quotation marks and citations omitted).

Evidence is relevant if it tends to make a fact more or less probable. *See* Pa.R.E. 401(a). Relevant evidence is generally admissible unless excluded by law, although the trial court may exclude evidence if its probative value is outweighed by the danger of unfair prejudice. *See* Pa.R.E. 402–403.

Pennsylvania Rule of Evidence 701 permits a lay witness to offer opinion testimony only when the opinion is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701(a)–(c). "[W]hen an officer is not qualified as an expert, the officer's lay opinion" as to meaning of slang or "street language" "is admissible only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Commonwealth v. Rose*, 172 A.3d 1121, 1131 (Pa. Super. 2017) (citation and emphasis omitted). In other words, lay testimony is "intended to describe something that jurors otherwise

had not been able to experience for themselves, by drawing upon the sensory and experiential observations that the witness made firsthand." ***Id***.

A court may take judicial notice only of "a fact that is not subject to reasonable dispute because it" is either generally known or capable of accurate and ready determination "from sources whose accuracy cannot reasonably be questioned." Pa.R.E. 201(b)(1)-(2).

The best evidence rule requires an original writing, recording, or photograph to prove its content unless otherwise provided by rule or statute. ***See*** Pa.R.E. 1002. In addition, the Commonwealth has mandatory discovery obligations in criminal cases, to generally "disclose . . . requested items or information, provided they are material to the instant case." Pa.R.Crim.P. 573(B)(1). A defendant may establish a ***Brady***[5] discovery violation only where the defendant "show[s] that: (1) the evidence was suppressed by the State, either willfully or inadvertently; (2) the evidence at issue is favorable to the defendant; and (3) the evidence was material, meaning that prejudice must have ensued." ***Commonwealth v. Chambers***, 807 A.2d 872, 887 (Pa. 2002).

"If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part —

---

[5] ***See Brady v. Maryland***, 373 U.S. 83 (1963); ***see also Commonwealth v. Chambers***, 807 A.2d 872, 887 (Pa. 2002) (explaining that ***Brady*** held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution).

- 16 -

or any other writing or recorded statement — that in fairness ought to be considered at the same time." Pa.R.E.106. "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

The Confrontation Clause in the Sixth Amendment to the United States Constitution guarantees a defendant's "right to confront and cross-examine adverse witnesses." **Rosser**, 135 A.3d at 1087; **see also** U.S. Const. amend. VI; **see also** Pa. Const., Art. I, § 9. However,

> the confrontation right is not absolute. It guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. Thus, trial courts retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

**Commonwealth v. Rogers**, 250 A.3d 1209, 1216 (Pa. 2021) (citations and quotation marks omitted).

We apply a two-part inquiry to determine whether a limitation on cross-examination violates the Confrontation Clause.

> First, we inquire whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a "significantly different impression" of the witness's credibility? Second, if there was error, we must determine whether it was harmless beyond a reasonable doubt; if so, reversal is not warranted.

\* \* \* \*

The right of confrontation, however, does not permit "fishing expeditions". The court may prohibit cross-examination on a particular subject "if the party is unable to lay a proper evidentiary framework." "Without such limits, unchecked cross-examination on a theory of bias may unfairly prejudice the opposing party's case and only bring forth 'marginally relevant' evidence." . . .

* * * *

. . . Therefore, . . . the Sixth Amendment does not entitle the defendant to cross-examine a Commonwealth witness on a subject for which the defendant cannot provide a factual foundation.

**Rosser**, 135 A.3d at 1088-89 (citations omitted).

Wright contends the trial court abused its discretion by: (1) permitting testimony concerning the slang term "cheese-eater" and allowing the Commonwealth to reference an Urban Dictionary definition of that term; (2) admitting jail calls that Wright claims were not disclosed in discovery; and (3) limiting Wright's attempt to introduce a TikTok video during cross-examination of Commonwealth witnesses.

The trial court concluded that Wright's claims lacked merit and, in many instances, he waived his claims due to the excessive and imprecise nature of his Rule 1925(b) statement. **See** Trial Court Opinion, 12/19/24, at 15-17. With respect to the slang terminology, the court determined that reference to an Urban Dictionary definition was permissible and that it afforded Wright ample opportunity to cross-examine witnesses regarding the meaning of the term. **See id**. at 19-20. The court further rejected Wright's claim that the Commonwealth improperly introduced prison calls, concluding that the

Commonwealth disclosed the recordings to standby counsel prior to trial and therefore did not commit a **_Brady_** violation. **_See id_**. at 22.

Upon review, we discern no abuse of discretion. **_See Woodard_**, 129 A.3d at 494. First, Wright challenges the admission of testimony concerning the slang term "cheese-eater" and the Commonwealth's reference to an Urban Dictionary definition of that term. However, the record reflects that Detective Dawson testified regarding the meaning of the term based upon his experience and familiarity with the conversation at issue. Such testimony falls within the scope of permissible lay opinion testimony rationally based on the witness's perception and helpful to the jury's understanding of the evidence. **_See_** Pa.R.E. 701(a)-(c); **_see also Rose_**, 172 A.3d at 1131. Moreover, the trial court afforded Wright a full opportunity to cross-examine witnesses and to present his own interpretation of the term through his witness Thompson. Under these circumstances, Wright has failed to demonstrate that the trial court's rulings resulted in unfair prejudice or otherwise constituted an abuse of discretion. To the extent the court referenced an online source for slang terminology, any such reference does not warrant relief, as the meaning of the term was explored through witness testimony subject to cross-examination.

Second, Wright contends the Commonwealth improperly introduced recordings of prison calls that it did not disclose in discovery. The trial court rejected this claim, noting that the Commonwealth provided the recordings to Wright's standby counsel approximately two years prior to trial. **_See_** Trial

Court Opinion, 12/19/24, at 22.  Thus, the record does not support Wright's assertion that the Commonwealth withheld the evidence.  In any event, Wright has failed to demonstrate prejudice, as he does not explain how earlier disclosure of the recordings would have altered his trial strategy or the outcome of the proceedings.  **See Chambers**, 807 A.2d at 887.

Wright also argues that the trial court improperly limited his attempt to introduce a TikTok video during cross-examination.  The record reflects that the court exercised its discretion to regulate the mode and order of presenting evidence.  **See** Pa.R.E. 611(a); **see also Rosser**, 135 A.3d at 1087. Nevertheless, Wright retained a meaningful opportunity to cross-examine the witnesses regarding the relevant images and testimony presented by the Commonwealth.  Because the Confrontation Clause guarantees only an opportunity for effective cross-examination — not cross-examination to whatever extent a defendant might wish — the trial court's limitations did not violate Wright's constitutional rights.  **See Rogers**, 250 A.3d at 1216.

To the extent Wright suggests that the trial court was required to admit the entirety of the TikTok video under the rule of completeness, he did not move to admit the video into evidence or establish that its admission was necessary to contextualize the portions of the evidence presented by the Commonwealth.  **See** Pa.R.E. 106.  Accordingly, no relief is due.

In his second issue, Wright challenges the trial court's denial of his motion for severance of the two criminal dockets.  When reviewing the severance of charges,

- 20 -

we begin with Pennsylvania Rules of Criminal Procedure 582 and 583, which govern the joinder and severance of offenses for trial. The decision to consolidate offenses in a single trial is within the trial court's sole discretion, which we will not reverse absent a determination that there was a clear injustice to the defendant or a manifest abuse of discretion.  . . .

Rule 582 permits offenses charged in separate informations to be consolidated for trial if "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion[.]"  Pa.R.Crim.P. 582(A)(1)(a).[]  The corresponding severance rule, Rule 583, authorizes a court to sever offenses (or defendants) for trial "if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583.  With these rules in mind, [our Supreme] Court crafted the following test to determine whether joinder or severance of separately-charged offenses is proper: (1) "whether the evidence of each of the offenses would be admissible in a separate trial for the other;" (2) "whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and," (3) "if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses."  . . .

**Commonwealth v. Walker**, 350 A.3d 54, 61 (Pa. 2026) (*citing*, *inter alia*,

**Commonwealth v. Lark**, 543 A.2d 491, 497 (Pa. 1988)).

In **Commonwealth v. Walker**, 350 A.3d 54 (Pa. 2026), the

Pennsylvania Supreme Court recently explained:

[Pennsylvania Rule of Evidence] 404(b) precludes the admission of evidence of a person's other bad acts (including other crimes) for the purpose of demonstrating the person's bad character — in other words, the Commonwealth cannot present evidence of a defendant's other bad acts solely for the purpose of establishing the defendant's propensity to commit crimes (*i.e.*, because he did it once, he probably did it again).  **See** Pa.R.E. 404(b)(1).

However, subsection (b)(2) clarifies that other bad acts evidence may be admissible if it is offered for another (legitimate)

purpose. *See* Pa.R.E. 404(b)(2). Rule 404(b)(2) includes a non-exclusive list of other purposes, permitting other bad acts evidence when it tends to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. In a criminal case, regardless of the proffered exception, other bad acts evidence is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).[]

*Id*. at 61–62 (footnote omitted and paragraph break added).

The Pennsylvania Supreme Court recently held:

When the admissibility of the defendant's other bad acts is premised upon the common plan, scheme, or design exception, the Commonwealth must establish either: (1) the offenses constitute "signature crimes" — that is, they are so unique and distinctive that they must have been committed by the same perpetrator — or; (2) the offenses were linked to achieve a common goal.[]  . . .

*Id.* at 75 (citation and footnote omitted).[6]  "The signature crime, or *modus operandi*, exception is most relevant when the identity of the perpetrator is at issue." *Id*. at 73.

---

[6] In so holding, the **Walker** Court abrogated the "logical connection" and "sufficient similarities" tests for determining whether evidence was admissible under the common scheme, plan, and design exception. **Walker**, 350 A.3d at 54. Those tests had set forth

a more general consideration as to whether the defendant's other bad acts share "sufficient similarities" with the offense on trial. In fact, a new test to determine "similarity" arose . . .  — courts were to consider "the elapsed time between the crimes, the geographical proximity of the crime scenes, and the manner in which the crimes were committed."

*Id*. at 64 (citation omitted).

The Supreme Court then applied this rule to the issue of consolidating cases and concluded:

> [T]he consolidation of separate offenses for a joint trial is permitted if, *inter alia*, the evidence of each offense would be admissible in a trial for the others as an exception to the rule precluding propensity evidence. **See** Pa.R.Crim.P. 582(A)(1)(a); Pa.R.E. 404(b). When the admissibility of the defendant's other bad acts is premised upon the common plan, scheme, or design exception, the Commonwealth must establish either: (1) the offenses constitute "signature crimes" — that is, they are so unique and distinctive that they must have been committed by the same perpetrator — or; (2) the offenses were linked to achieve a common goal.[]

*Id*. (footnote omitted).

Wright contends that the trial court abused its discretion in denying severance because: (1) the two shootings were unrelated; (2) the evidence from each case would not have been admissible in a separate trial for the other; and (3) the joinder allowed the jury to cumulate inflammatory evidence and infer a criminal propensity.

The trial court determined that the cases "were properly joined for trial . . . and could easily be considered by a jury without danger of confusion." Trial Court Opinion, 12/19/24, at 24.

Applying the **Walker** framework, we discern no abuse of discretion. **See Walker**, 350 A.3d at 61; **see also Woodard**, 129 A.3d at 494. Here, we analyze the Commonwealth's theory under Rule 404(b)(2)'s identity exception. The evidence from each shooting would have been admissible in a separate trial for the other to establish identity, a permissible purpose under

Rule 404(b)(2), provided the offenses share sufficiently distinctive characteristics as required by **Walker**. **See Walker**, 350 A.3d at 61–62.

We recognize that this is a close case under **Walker**. There, our Supreme Court concluded that evidence of the defendant's involvement in multiple sexual assaults was inadmissible under Rule 404(b), even where DNA evidence linked the defendant to each offense, because the crimes lacked distinctive features establishing a common plan, scheme, or identity. **See Walker**, 350 A.3d at 73–75.

This case, however, differs in a critical respect. Unlike **Walker**, where the Commonwealth relied primarily on a single category of evidence — DNA — to connect otherwise factually dissimilar offenses, the Commonwealth here presented multiple, independent linking factors. The evidence established that the same firearm was used in both shootings, that the shooter in each incident operated the same color and model vehicle, and that the shooter's clothing was consistent across surveillance footage of both shootings and Wright's own social media posts.

While none of these factors, standing alone, may have established identity, their combination reflects a set of shared and distinctive characteristics supporting admissibility under the identity exception to Rule 404(b)(2). **See Walker**, 350 A.3d at 73-75 (emphasizing the need for evidence that does more than suggest a defendant's criminal disposition). Taken together, the evidence — specifically, the use of the same firearm, the

same vehicle, consistent clothing depicted in surveillance and social media, and the temporal proximity of the offenses — establishes a sufficiently distinctive pattern to support admission for purposes of identity rather than propensity. Additionally, both incidents involved targeted shootings in public settings in which the victims sustained non-fatal gunshot wounds to their lower extremities.

Moreover, the evidence was capable of separation by the jury. Each shooting involved distinct victims, locations, and investigative evidence, minimizing any risk of confusion.

Finally, Wright has not demonstrated undue prejudice. The mere fact that the evidence of multiple crimes may be damaging does not warrant severance where the evidence is otherwise admissible and the jury is capable of compartmentalizing it. Accordingly, the trial court did not abuse its discretion in denying Wright's motion to sever, and no relief is due.

In his third issue, Wright argues that the trial court erred in granting a motion to quash the subpoenas he issued to certain health care providers, and in limiting expert testimony regarding Quinn's injuries. "When reviewing a court's disposition of a motion to quash a subpoena, we grant great deference to the factual findings of the trial court. We will affirm the court's decision unless we find that the court abused its discretion or committed an error of law." *Commonwealth v. Cook*, 865 A.2d 869, 876 (Pa. Super. 2004) (citation omitted). A trial court may also quash subpoenas where compliance

would impose an undue burden or where the party seeking the testimony fails to establish its relevance or admissibility. ***See*** Pa.R.E. 401–403.

Likewise, "[w]hen reviewing a decision to admit or to exclude expert opinion testimony, we use an abuse-of-discretion standard." ***Commonwealth v. Pi Delta Psi, Inc.***, 211 A.3d 875, 881 (Pa. Super. 2019) (citation omitted). A trial court abuses its discretion only where "the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will." ***Id***. (citation omitted).

As noted above, a trial court possesses broad discretion to control the presentation of evidence and the examination of witnesses. ***See*** Pa.R.E. 611(a). "A party may claim error in a ruling to [limit] evidence only [if the] party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Pa.R.E. 103(a)(2). "An offer of proof must be sufficient to alert the trial judge to the purpose for which the evidence is being offered, and a trial court's [limiting] of evidence must be evaluated on appeal by a review of the contents of the offer at the time it was made." ***Commonwealth v. Newman***, 555 A.2d 151, 156 (Pa. Super. 1989) (citations omitted).[7] A failure to make an offer of proof results in waiver

---

[7] We may rely on caselaw predating the enactment of the Pennsylvania Rules of Evidence to the extent the caselaw does not contradict the rules. ***See Commonwealth v. Aikens***, 990 A.2d 1181, 1185 n.2 (Pa. Super. 2010).

because, if an appellate court does not "know the substance of [the] statements, [it] cannot determine if the [trial] court erred in [limiting] the disputed testimony." **Commonwealth v. Fisher**, 681 A.2d 130, 143 (Pa. 1996) (citation omitted).[8]

Wright argues that the trial court erred in granting the motion to quash filed by Dr. Calaitges, who assisted Dr. Lawrence in the operating room during Quinn's surgery. Wright contends that he timely issued the subpoena and that the physician's testimony was necessary to explain the conclusions in his medical report. Wright also argues that the trial court improperly required him to reveal aspects of his trial strategy when requesting an offer of proof and erred in denying his request to exclude the prosecutor and detectives from the hearing on the motion to quash.

In addition, Wright maintains that Dr. Calaitges' medical notes reflected that Quinn sustained an entry wound on the medial side of the leg and an exit wound laterally. Wright asserts that this conclusion demonstrated that the shooter had to have stood to Quinn's right, which he claims conflicted with the Commonwealth's surveillance video depicting the shooter standing to Quinn's

---

[8] We note that **Fisher** held that victim-impact testimony was not admissible during the penalty phase in a capital case. **Fisher**, 681 A.2d at 266-67. This rule was superseded by statute, as noted in **Commonwealth v. Tedford**, 960 A.2d 1 (Pa. 2008). **See Tedford**, 960 A.2d at 40 n.28. Nevertheless, this aspect of the law is not at issue in this appeal.

left. Wright therefore maintains that Dr. Calaitges' testimony was critical to his defense.

Wright further asserts that the trial court improperly discounted Dr. Calaitges' conclusions and suggested that neither Dr. Calaitges nor the Commonwealth's expert, Dr. Lawrence, was qualified to determine entry and exit wounds. Wright claims that the trial court's remarks improperly discredited his defense and bolstered the Commonwealth's position before the jury.

The trial court rejected Wright's claim and concluded that it properly quashed the subpoena issued to Dr. Calaitges. The trial court explained that counsel for Dr. Calaitges asserted that compelling his testimony would raise significant patient privacy concerns under HIPAA and would create hardship by interfering with his patient-care obligations. *See* Trial Court Opinion, 12/19/24, at 29.

The trial court further found that Wright issued the subpoena shortly before trial, which created hardship for Dr. Calaitges. *See id*. at 30. In addition, the court determined that "requiring [Dr. Calaitges'] testimony would breach duties of patient confidentiality[,]" and was not relevant to whether Quinn suffered a serious bodily injury. *Id*. The trial court noted that the Commonwealth offered to stipulate to the authenticity of the relevant medical records, thereby allowing Wright to rely on the records without requiring the

providers' testimony. Based on these considerations, the trial court concluded that it properly granted the motion to quash. **See id**.

Finally, the trial court rejected Wright's claim regarding Dr. Lawrence's testimony. The court explained that Wright attempted to question Dr. Lawrence regarding the conclusions contained in the report of another physician, Dr. Calaitges. The trial court reasoned as follows:

> The Commonwealth objected to [Wright's] question to Dr. Lawrence regarding the report of Dr. Calaitges as beyond the scope of direct testimony. The [c]ourt stated its reasoning for limitation of the witness' testimony regarding the basis of the opinion of another physician. In response to the [c]ourt's explanation of its reasoning, [Wright] stated, "Oh, okay. Thank you, Your Honor[]. Therefore, Wright waived [this] claim of error.

Trial Court Opinion, 12/19/24, at 29 (citations omitted).

Upon review, we discern no abuse of discretion. **See Cook**, 865 A.2d at 876. First, the trial court acted within its discretion in quashing the subpoena issued to Dr. Calaitges. The trial court reasonably concluded that compelling the testimony of Dr. Calaitges would have raised patient privacy concerns and imposed hardship on his medical obligations. Moreover, the Commonwealth offered to stipulate to the authenticity of the relevant medical records, thereby allowing Wright to rely on those records without requiring the providers' live testimony. Under these circumstances, Wright has failed to demonstrate that the trial court's ruling was manifestly unreasonable or constituted an abuse of discretion. **See Pi Delta Psi, Inc.**, 211 A.3d at 881.

Second, the record supports the trial court's reasoning that Wright waived his claim regarding the limitation of Dr. Lawrence's testimony. Because Wright failed to provide an offer of proof explaining the substance and relevance of the proposed testimony, we cannot determine whether the trial court erred in excluding the evidence, and he has waived this claim. *See* Pa.R.E. 103(a)(2); *see also Fisher*, 681 A.2d at 143.

Further, when the Commonwealth objected to Wright's questioning of Dr. Lawrence regarding the conclusions of another physician, the trial court explained its ruling on the record. Wright responded, "Oh, okay. Thank you, Your Honor," and did not pursue the objection further. N.T., 12/12/23, at 262. Because Wright failed to preserve specific challenges to the trial court's rulings or articulate grounds for admissibility in response to the Commonwealth's objections, he was waived them for appellate review. *See* Pa.R.A.P. 302(a). To the extent the trial court excluded evidence, Wright also failed to present an offer of proof. *See* Pa.R.E. 103(a)(2). Accordingly, Wright's claims that the trial court erred in granting the motion to quash the subpoenas and limiting expert testimony do not merit relief.

In his fourth issue, Wright argues that the trial court improperly restricted his cross-examination of Commonwealth witnesses or otherwise interfered with the presentation of his defense. As noted above, a trial court possesses broad discretion to control the scope and extent of cross-

examination, and we will not disturb the court's ruling absent an abuse of discretion. *See Rosser*, 135 A.3d at 1087.

Specifically, Wright contends that the trial court: (1) repeatedly interfered with his cross-examination of Commonwealth witnesses, including Detective Dawson, Detective Carriere, and McGhee; (2) improperly raised objections on behalf of the Commonwealth; and (3) applied a double standard in limiting his questioning while permitting the Commonwealth to make argumentative statements during its cross-examination of him. Wright identifies several instances in which the trial court interrupted his questioning of these witnesses, including by limiting his attempts to elicit testimony, reframing or posing questions to witnesses, and sustaining or prompting objections — at times without any objection from the Commonwealth. He further asserts that the court restricted his efforts to challenge witness credibility, particularly during his cross-examinations of Detective Dawson, Detective Carriere, and McGhee.

Wright also raises a claim regarding the conduct of the prosecutor during his testimony. Wright asserts that "[t]he cross-examination of [him] amounted to little more than argument between [him] and the Commonwealth, and direct statements and attacks upon the former by the latter." Wright's Brief at 54. He further challenges the trial court's management of the proceedings, arguing that the trial court "did not in any of these exchanges (or at any point in the trial) correct the Commonwealth

whether [he] objected or not." ***Id***. at 55. Wright maintains that this conduct undermined his credibility before the jury and improperly restricted his ability to present his defense as a *pro se* litigant.

The trial court concluded that Wright waived these claims by failing to object to its rulings at trial. ***See*** Trial Court Opinion, 12/19/24 at 26-32. The court further determined that, even if preserved, no relief was due because it acted within its discretion to control the examination of witnesses and the orderly presentation of evidence. In particular, the court noted that Wright was afforded wide latitude in cross-examining Detective Dawson, Detective Carriere, and McGhee and that any limitations imposed were intended to maintain relevance and prevent improper questioning.

Upon review, we discern no abuse of discretion. ***See Rosser***, 135 A.3d at 1087. To the extent Wright challenges the trial court's limitation of his cross-examination, the record reflects no contemporaneous objection to the rulings he now challenges. ***See*** Pa.R.A.P. 302(a). Accordingly, the claim is waived.

In his fifth issue, Wright claims that the trial court erred in permitting the Commonwealth to reference his incarceration during trial and in denying his request for a mistrial on that basis. Generally, the decision to grant a mistrial is within the sound discretion of the trial court, whose decision we will not reverse absent a manifest abuse of discretion. ***See Commonwealth v. Bryant***, 67 A.3d 716, 728 (Pa. 2013). "A mistrial is an extreme remedy that

is required only where the challenged event deprived the accused of a fair and impartial trial." *Id*. (citation omitted).

Pennsylvania Rule of Criminal Procedure 605 provides that a defendant may move for a mistrial when an event prejudicial to him occurs. Pa.R.Crim.P. 605(B). Such a motion "shall be made when the event is disclosed." *Id*.

"[T]here is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged." *Commonwealth v. Johnson*, 838 A.2d 663, 680 (Pa. 2003). Furthermore, a brief mention of a defendant's incarceration may not necessarily unduly prejudice the defendant. *See Commonwealth v. Horne*, 89 A.3d 277, 288 (Pa. Super. 2014). The United States Supreme Court has observed that only a constant or repeated reminder of a defendant's incarceration status rises to the level of a mistrial because it may affect the jury's judgment and ultimately prejudice the defendant. *See Estelle v. Williams*, 425 U.S. 501, 504-05 (1976).

Wright argues that at trial, the Commonwealth improperly referenced his incarcerated status. By way of background, we reiterate that, during its cross-examination of Thompson, the Commonwealth elicited testimony that Thompson was incarcerated and generally housed in the same facility as Wright. On appeal, Wright asserts that these references prejudiced the jury and created the impression that he had engaged in prior criminal conduct.

Wright therefore contends that the trial court should have granted his request for a mistrial.

The trial court concluded that Wright did not have a basis for a mistrial. The court explained that Wright failed to make a timely objection to the Commonwealth's reference to his being incarcerated, and Wright did not request a mistrial until after Thompson had completed his testimony. *See* Trial Court Opinion, 12/19/24, at 18. The court further reasoned that the Commonwealth properly questioned Thompson regarding how he knew Wright in order to demonstrate potential bias and to challenge the witness's credibility. *See id*. In addition, the court determined that Wright suffered no prejudice because the jury had already heard recordings of Wright's prison calls and was therefore aware of his incarceration. *See id*.

Upon review, we discern no abuse of discretion. *See Bryant*, 67 A.3d at 728. Wright did not object to the Commonwealth's question at the time the Commonwealth asked it and requested a mistrial only after Thompson had completed his testimony. *See* Pa.R.Crim.P. 605. Thus, he has waived this issue for our review.

Moreover, the record reflects that the challenged reference occurred in the context of Thompson's testimony explaining how he knew Wright and how investigators obtained recorded prison calls. Such testimony was relevant to the investigation, and the Commonwealth did not offer it to establish Wright's criminal propensity. Furthermore, because the jury had already heard

recordings of Wright's prison calls, the brief reference to his incarceration did not deprive him of a fair trial. *See Bryant*, 67 A.3d at 728. Accordingly, no relief is due on this claim.

In his sixth issue, Wright claims that the trial court erred by failing to place all sidebar discussions during trial on the record. "In court cases, after a defendant has been held for court, proceedings in open court shall be recorded." Pa.R.Crim.P. 115(A). "However, nothing in this rule prohibits the trial court from conducting off-the-record sidebar discussions." *Commonwealth v. Montalvo*, 641 A.2d 1176, 1185 (Pa. Super. 1994).[9]

Wright contends that the trial court failed to place certain sidebar discussions on the record and that the absence of those discussions prevents meaningful appellate review. The trial court rejected this claim, explaining that Wright "fail[ed] to state with sufficient specificity at what point in the trial the court failed to ensure that sidebar discussions [took] place on the record. Therefore, such claim is waived." Trial Court Opinion, 12/19/24, at 24.

Upon review, Wright has not identified any specific sidebar discussion the trial court improperly omitted from the record. He has thus waived this issue for our review. *See* Pa.R.A.P. 2119(a). Moreover, Wright has not

---

[9] *Montalvo* addressed the predecessor rule, which was Pa.R.Crim.P. 9030(a), and was identical to the current Rule 115(A). *See Montalvo*, 641 A.2d at 1185.

demonstrated that any alleged omission from the record impairs meaningful appellate review or resulted in prejudice. Accordingly, no relief is due.

In his final issue, Wright argues that the trial court's conduct demonstrated bias, improperly interfered with his questioning of witnesses, and violated his right to represent himself. In support, Wright identifies numerous instances throughout the trial in which the court allegedly reprimanded him in the presence of the jury. He also cites several exchanges in which the trial court allegedly permitted the prosecutor to make argumentative statements during cross-examination.

Additionally, Wright points to specific comments by the trial court that he characterizes as demeaning or prejudicial, including remarks concerning his *pro se* status and his questioning techniques. He further asserts that the trial court improperly required standby counsel to act on his behalf during sidebar discussions and other proceedings, thereby infringing upon his right to self-representation.

However, despite these references, Wright fails to develop a coherent legal argument demonstrating that the trial court's conduct constituted reversible error. His discussion consists largely of lengthy narrative, conclusory allegations of bias, and scattered citations to the record, without meaningful analysis or application of governing legal principles. Accordingly, Wright has waived this claim. **See** Pa.R.A.P. 2119(a); **see also Sanford**, 445 A.2d at 150.

Although Wright characterizes the trial court's remarks as biased or prejudicial, he does not cite any place in the record where he lodged a timely and proper objection to the trial court's challenged remarks. **See** Pa.R.Crim.P. 605. He likewise fails to demonstrate prejudice beyond that inherent in the court's management of proceedings involving a *pro se* litigant. In any event, our review of the record reveals no conduct demonstrating partiality, prejudice, or bias on the part of the trial court that would warrant relief. Thus, no relief is due.

For all of the foregoing reasons, Wright is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/10/2026